[L. A. No. 13331. In Bank.—March 30, 1934.]

EUGENE SWARZWALD et al., Appellants, v. HALLAM COOLEY et al., Respondents.

Libby & Sherwin and Warren E. Libby for Appellant.

Victor Ford Collins, Walter Haas, Harold C. Johnston, Vinetz & Gitelson, G. E. Terrin and Stanley F. Maurseth for Respondents.

PRESTON, J.—The record shows an action by plaintiffs Swarzwald and a cross-action by defendant Cooley, both in form to quiet title and to locate the oceanward extremity of a common boundary line. The bank and the other defendants are only nominally interested in the result of this litigation, the former being the trustee and the latter beneficiaries under a real estate subdivision trust, of which the lands in question are a part.

The controlling question is the true location of the common point in the line of ordinary high tide, or mean high tide, of the Pacific Ocean, which, in May and June, 1927, marked the southerly terminus of the northwest boundary line of lot 9 and the like terminus of the southeast boundary line of lot 8, both situate in a subdivision of Laguna Beach

lands in Orange County, California, officially designated as Arch Palisades No. 2.

Description of these lots originates in the southwest boundary line of the state coast highway. They are each 100 feet in width along this highway and the laterals are uniform lines parallel to each other and perpendicular to said highway line, terminating in said mean high-tide line, or ordinary high-tide line, of the ocean. After meeting said tide line, lot 8 extends in the shape of a tongue or promontory several hundred feet farther into deep water. The two lots are a part of some 17 lots in said subdivision, all of which originate at said highway line, have fairly uniform side lines and in a similar manner meet said tide line as their southerly boundary. Lot 17 is similarly situated, with respect to the said promontory feature, to lot 8. Although a regular subdivision map of said tract was filed in the office of the county recorder of said Orange County on March 26, 1927, these lots were conveyed by a metes and bounds description on a survey presumably made about November 15, 1926.

The contention of respondent Cooley (defendant and cross-complainant), who prevailed in the court below, is that the northwest boundary of lot 9 is a line exactly 376 feet long, extending from the point of beginning on a course south 59 degrees 21 minutes 30 seconds west from said point of beginning. The contention of appellants Swarzwald (plaintiffs and cross-defendants) is that said line terminates, not at 376 feet, but at 592 feet along the same course from the point of beginning, or at least that it is 80 feet longer than 376 feet, which would terminate it where the irregular shape of lot 8 juts athwart its course.

The casus belli is the existence of a sandy beach in front of these lots and principally in front of lot 9, between the toe of the bluff line and the line of mean high tide. The court below made findings and gave its decree favoring the contention of Cooley and plaintiffs appealed upon a full record. ■ The court made two important findings of fact, as follows: (1) That the southeasterly boundary of said lot 9 terminated at the line of ordinary high tide as of May 9 or June 10, 1927, at exactly 382 feet along a line perpendicular to said highway and that its northwest boundary line terminated at exactly 376 feet from the point of

beginning of said lot, along a line whose course was south 59 degrees 21 minutes 30 seconds west. (2) That no accretion had gathered in front of said lots between November 15, 1926, and June 10, 1927, but that such accretions had occurred between June 10, 1927, and November 22 or December 28, 1928; and further that the ancient or original mean high-tide line, at said point 376 feet from the point of beginning of the northwest boundary of lot 9 and the northeast boundary of lot 8, was circular in character; presumably said ancient high-tide line was found to be exactly circular or so nearly so that for practical purposes it could be so treated.

Pursuant to the latter finding the court, on its own motion, appointed an expert who proceeded to measure said original arc in said shore line at the point where it met said common boundary between these lots and to there construct a tangent to same, followed by projecting a perpendicular line to said tangent until it met the present line of mean high tide. The court adopted the result of this effort of the expert and declared that a line projected in said manner was the equitable division line fixing the rights of the parties in and to said accreted lands. The course of this line was south 12 degrees 0 minutes west from said terminus. The effect of said action was to vary the boundary line between said lots in excess of 47 degrees from its last and final course and, to that extent, cause it to pass in front of lot 9. A line so constructed would in effect place a large part of the accreted land belonging to lot 8 prominently in front of lot 9.

We have reached the conclusion that the learned trial court fell into prejudicial error in both of the above findings. Treating them in the order stated, we can discover no sufficient evidence to justify the finding that the line of mean high tide would be exactly 376 feet on the northwest boundary or 382 feet on the southwest boundary of lot 9. The official map was conclusively shown to be inaccurate as to the location of the tide line and, in this behalf, it was entirely disregarded by the expert appointed by the court. The map, too, was off scale as much as 40 to 50 feet in some of its boundaries and the expert appointed by the court thought that the line here in dispute had that percentage of error on the map. Even taking the map as accurate, it

does not purport to measure said distance either at 376 feet to the one point or 382 feet to the other. The measurements are given as exact only to the ocean bluff and the measurements from that point to the line of ordinary or mean high tide are only approximations. The engineer who made the survey was examined as a witness and his field-notes were placed in the record. He frankly admitted that the measurements, as the notes show, were only approximations from the bluff line to the tide line. In fact, he said that they were estimates made with the eye only, said observations being made from the top of the bluff overlooking the ocean. No measurements with chains or instruments were made and there was no effort to locate the tide line as of that day in any manner whatsoever. As already noted, this survey was as of November 15, 1926. These parties made their purchases in said subdivision in May and June, 1927. The court found that the line of ordinary high tide had not changed during this period. Yet the survey of one Peabody, made December 22, 1928, indicates that said line of ordinary high tide met the northwest boundary of lot 9 at a distance of approximately 415 feet from the point of beginning, or some 39 feet beyond the point found by the court as of June, 1927. It is strange that no sand or alluvium was deposited in the first year and that much was deposited in the second. Plaintiffs' witnesses fixed this line, by a survey made November 22, 1928, at 592 feet from point of beginning. Moreover, the pleadings admit that said line was in excess of 376 feet in length when this action was instituted on March 1, 1929. We are, therefore, utterly unable to find any evidence that even tends to support the finding in question or, in fact, any finding as to the location of said tide line previous to the fall of 1928.

Secondly, if the point where the court erected the arc, tangent and perpendicular does not correctly designate the southerly terminus of the northwest boundary of lot 9, it follows as of course that the whole superstructure, built on the assumption that the point is properly located, must fall. Moreover, the method employed by the expert in establishing this arc seems entirely unreliable. He assumed the northwest boundary line to terminate at 376 feet and the southeast boundary line at 382 feet. He then set his instrument at a point marking 376 feet and, with the naked eye, viewed

the ocean bluff as it then appeared to him; then by using his judgment, he projected the arc found by the court. No point on the ancient shore line at any place, either northwest or southwest of said 376 foot point, was located, nor was any effort made by the use of any such point to establish a mean curve to mark the ancient shore line nor to project a tangent and perpendicular thereto at said point when located.

We, therefore, conclude that the mean high-tide line, as of May or June, 1927, was a natural monument, fixing the southerly boundary of all these lots and that no sufficient evidence whatsoever can be found in the record to establish the said line as of that date, if indeed any change at all has occurred in it since then. We further hold that said natural monument will control the measurement found in the contracts and conveyances made.

We are asked to interpret the case of *Fraser's etc. P. Co.* v. *Ocean Park P. Co.*, 185 Cal. 464 [197 Pac. 328, 198 Pac. 212], and set up a proper formula for the division of accreted lands at a point such as the one in question. It will be noted that here the latest surveys before us are the ones made in November and December, 1928, now more than five years ago. But inasmuch as both parties seem to concede that probably there may be accretions existing which this property abuts, we feel impelled to say that we interpret the above case as setting forth the general rule of the common law by which accretions are to be subdivided. The court there said: ''If accretions occur in front of the land the boundary line between them as to such accretions is a line extending into the water perpendicular to the original shore line in its general course and not by the line of the boundary extended in its original direction. If this were not the case it will be seen that where the boundary line strikes the shore line at an acute angle the rights of one proprietor would extend in front of the land of the other so as to practically cut him off from the use of the water. The authorities are all to the effect that this is not the case. (3 Farnham on Waters, pp. 2476, 2477; *Menasha etc. Co.* v. *Lawson*, 70 Wis. 600 [36 Wis. 412]; *People* v. *Schermerhorn*, 19 Barb. [N. Y.] 540.)''

This rule follows closely the case of *Inhabitants of Deerfield* v. *Pliny Arms*, 17 Pick. (34 Mass. 41) [28 Am. Dec.

276], where the court said: "The rule is, 1. To measure the whole extent of the ancient bank or line of the river, and compute how many rods, yards or feet, each riparian proprietor owned on the river line. 2. The next step is, supposing the former line, for instance, to amount to 200 rods, to divide the newly formed bank or river line into 200 equal parts, and appropriate to each proprietor as many portions of this new river line, as he owned rods on the old. Then, to complete the division, lines are to be drawn from the points at which the proprietors respectively bounded on the old, to the points thus determined as the points of division on the newly formed shore. The new lines, thus formed, it is obvious, will be either parallel, or divergent, or convergent, according as the new shore line of the river equals, or exceeds or falls short of the old."

This doctrine has, in turn, been confirmed by the United States Supreme Court in the case of *Johnston* v. *Jones*, 1 Black (66 U. S.) 209, 223 [17 L. Ed. 117].

But both of the above cases also recognize exceptions to the general rule, as witness the following further language from the Deerfield case, *supra:* "It may require modification, perhaps, under particular circumstances. For instance, in applying the rule to the ancient margin of the river, to ascertain the extent of each proprietor's title on that margin, the general line ought to be taken, and not the actual length of the line on that margin if it happens to be elongated by deep indentations or sharp projections. In such case, it should be reduced by an equitable and judicious estimate, to the general available line of the land upon the river."

This latter exception was indorsed and applied in the case of *Brown* v. *Spreckels*, 18 Hawaii, 91, 103. The court there held, under facts similar to those of the instant case, that there was enough to justify a finding that the accretion belonged to the land in front of which it was formed.

A general statement of the object to be accomplished by subdivision of accretions is found in *Allen* v. *Wood*, 256 Mass. 343 [152 N. E. 617, 621], as follows: "The object of apportioning accretions is that they shall be so apportioned as to do justice to each owner, in the absence of a positive prescribed rule and of direct judicial decision to guide, and their division on a nonnavigable river frontage is so made

as to give each relatively the same proportion in his ownership of the new river line that he had in the old."

See, also, *Brown* v. *Spreckels, supra,* at page 103, where the court said: "The correct and more general rule is that the division of accretions should be equitable with a view to giving each proprietor a fair portion of the accretions and access to the water, in view of the contour and location of the respective lands before the accretions were formed. For instance, the general line of the shore would ordinarily be taken and the relative lengths of frontage upon it irrespective of deep indentations and sharp projections."

There is nothing in the case of *Fraser's etc. P. Co.* v. *Ocean Park P. Co., supra,* at variance with these principles or with the exceptions noted to the general rule. By use of the phrases "at that point" and "at that place" the court did not mean to limit its other pronouncement defining the original line as the "general course" of the "original shore line". One point will not determine a line nor two points an arc. At least three points are necessary to describe an arc. What is meant by the original general shore line is the general course of the line marking the margin of the properties as a whole and it is altogether possible that to determine it in some cases it would be necessary to consider points in the shore line nearby the particular margin in question. And applying this observation to the case before us, it may be found advisable to consider the whole marginal front from lot 8 to lot 17 to determine the general course of the ancient shore line. In fact, the court, on a reinvestigation of this case, may find it feasible to merely project the parallel lines on all of these lots to properly subdivide accretions between the several owners of frontage.

The judgment is reversed with directions to proceed in a manner not inconsistent with the conclusions above announced.

Waste, C. J., Curtis, J., Shenk, J., and Seawell, J., concurred.

Rehearing denied.