[Civ. No. 12496. Second Appellate District, Division Two.—May 28, 1940.]

EUGENE SWARZWALD et al., Respondents, v. HALLAM COOLEY et al., Defendants.

Loeb & Loeb, Milton H. Schwartz, Norman Newmark and Keating Coffey for Appellants.

Warren E. Libby for Respondents.

MOORE, P. J.—This action involves two adjacent beach lots in Laguna Beach. The owners sued each other to establish the length of their common lateral boundary. This is the second appeal. At the first trial, defendant Cooley had judgment on his cross-complaint, fixing the length of said common boundary at 376 feet. On appeal, the Supreme Court reversed the judgment, *Swarzwald* v. *Cooley*, 220 Cal. 438 [31 Pac. (2d) 381]. In its opinion, the Supreme Court thus defined the issues: ''The record shows an action by plaintiffs Swarzwald and a cross-action by defendant Cooley, both in form to quiet title and to locate the oceanward extremity of a common boundary line. The bank and the other defendants are only nominally interested in the result of this litigation, the former being the trustee and the latter beneficiaries under a real estate subdivision trust, of which the lands in question are a part.

''The controlling question is the true location of the common point in the line of ordinary high tide, or mean high tide, of the Pacific Ocean, which, in May and June, 1937, marked the southerly terminus of the northwest boundary line of lot 9 and the like terminus of the southeast boundary line of lot 8, both situate in a subdivision of Laguna Beach lands in Orange County, California, officially designated as Arch Palisades No. 2.

''Description of these lots originates in the southwest boundary line of the state coast highway. They are each 100 feet in width along this highway and the laterals are uniform lines parallel to each other and perpendicular to said highway line, terminating in said mean high tide line, or ordinary

high tide line, of the ocean. After meeting said tide line, lot 8 extends in the shape of a tongue or promontory several hundred feet farther into deep water. The two lots are a part of some 17 lots in said subdivision, all of which originate at said highway line, have fairly uniform side lines and in a similar manner meet said tide line as their southerly boundary. Lot 17 is similarly situated, with respect to the said promontory feature, to lot 8. Although a regular subdivision map of said tract was filed in the office of the county recorder of said Orange county on March 26, 1927, these lots were conveyed by a metes and bounds description on a survey presumably made about November 15, 1926.

"The contention of respondent Cooley (defendant and cross-complainant) who prevailed in the court below, is that the northwest boundary of lot 9 is a line exactly 376 feet long, extending from the point of beginning on a course south 59 degrees 21 minutes 30 seconds west from said point of beginning. The contention of appellants Swarzwald (plaintiffs and cross defendants) is that said line terminates, not at 376 feet, but at 592 feet along the same course from the point of beginning, or at least that it is 80 feet longer than 376 feet which would terminate it where the irregular shape of lot 8 juts athwart its course."

Both lots were purchased from a common grantor, to wit: The Bank of Italy, which held the property in a subdivision trust. The plaintiffs purchased the north half of lot 9 on a contract May 9, 1927. A month later they acquired the south half. Lots 7 and 8 were first sold to one Raymond Griffith on May 2, 1927. Cooley acquired Griffith's title and after said reversal, the Union Bank and Trust Company took over certain interests from Cooley and was made a party defendant and cross-complainant.

In the Griffith contract, the common boundary was described thus: "thence south 59 degrees, 21 minutes, 30 seconds west 376.00 feet more or less to a point in the line of ordinary high tide". In plaintiffs' contract of May 9, 1927, after describing its southeast lateral as " . . . 379 feet more or less to a point in the line of ordinary high tide to the Pacific Ocean; thence northwesterly along the line of ordinary high tide to a point located 376 feet south 59 degrees 21 minutes 30 seconds west from the point of beginning". Lot 9 in the main extends oceanward on a level with the coast highway

till it breaks precipitately at a cliff about 336 feet from said highway. Between the toe of the cliff and the ocean is a beach or sandy area. The cliff continues across lot 9 in the same general northwesterly direction into lot 8 and, after making a large indentation or "cove" in the southerly side of lot 8, it continues its irregular line back across said common boundary leaving a portion of said promontory and its abutting flat rock within lot 9. West of said "cove" said promontory continues to its end fairly on a level with the front portion of said lot 8.

On the second trial plaintiff had judgment. The court made a finding that the southeasterly boundary of lot 9 ran 385 feet from the highway to a point in the ordinary high tide; thence northwesterly along the line of ordinary high tide to the point of its intersection with said common boundary; that said point of intersection is 581.45 feet more or less, south 59 degrees, 21 minutes, 30 seconds west from the point of beginning in the highway and not 376 feet from the highway as the parties believed at the time of purchase. Said point of intersection is in the end of said rocky promontory about 265 feet south of the toe of the cliff. But the return of the line of said cliff after making said indentation into lot 9 cuts off access to the ocean across said sandy beach of lot 9. Because of the loss of said right of access to the ocean from the southerly side of lot 8, defendants prosecute this appeal.

The grounds upon which defendants seek a reversal of the judgment are as follows: (1) That the judgment is not supported either by a finding or by evidence upon which the finding could be based as to the location of the line of ordinary high tide on May 9 or June 10, 1927; (2) that the judgment deprives said defendants of property which had been sold to their predecessor Griffith prior to plaintiff's acquisition of said lot 9; that the court erred in not holding that the phrase "line of ordinary high tide" should not be given its meaning commonly accepted rather than its technical meaning; (4) that giving precedence to the reference to the line of ordinary high tide, which was inserted by conjecture produces an absurd result contrary to the manifest intention of the parties; (5) that the original sale of lot 8 to Griffith carried with it an easement, by implication, of access to the water across the beach in front of lot 9 and plaintiff took title subject to such easement.

█ I. The court found that said point in the common boundary 376 feet from the highway, mentioned in plaintiffs' said contract was not in the line of ordinary high tide; but that by actual survey of the court's surveyor, A. J. Stead, it is shown that said common boundary does not intersect the ordinary or mean high tide line until it has been extended a distance of 581.45 feet from said highway, and that, contrary to defendants' contentions, no one of the parties acted under a mistake of fact that the point 376 feet from the said highway, on said common boundary, ended at the line of ordinary high tide or that the same was the entire northwesterly boundary of said lot 9 or that said 376 feet exactly represented the distance of the ordinary high tide line from said highway; but that they both believed that said distance was always *more or less*. Not only was said finding supported by the surveys made before and during the trial but as well by other scientific data, by observations, and by the history of said beach.

█ The plane of ordinary high tide is, itself, a fixed monument. It is the average height of all the high waters at a particular locality over a considerable period of time. (H. A. Marmer, Bulletin, Department of Commerce.) Speaking with scientific accuracy, ordinary high tide is a surface which is curved more or less in conformity with the spheroidal shape of the earth. For practical purposes, within a restricted area, however, it may be conceived as a level plane. The *"line* of ordinary high tide'' is the intersection of said plane with the surface of the land. If the land at the line of said intersection consists of loose sand easily removed and easily deposited, then said line will have a variable position in relation to its horizontal coordinates. The mean high tide at said beach is 5.1 feet above ''mean lower low water'' or zero tide, as established by the United States Coast and Geodetic Survey.*

In order to ascertain its elevation on said beach, the surveyor began with data already ascertained by said Coast and

---

*E. Lester Jones, in Bulletin 351 of the United States Coast and Geodetic Survey, issued by the Department of Commerce in 1926, states that, while the plane of mean low water has been adopted on navigation charts for the whole of the Atlantic and Gulf Coast, yet on the Pacific Coast, because of the diurnal inequality of the tides, the plane of mean lower low water has been adopted.

Geodetic Survey, referred to in bench marks at points along the shore and which are on file in the Department of Commerce, in the District of Columbia. In this instance, the surveyor took the altitude of the nearest bench mark; surveyed down to the beach in front of lot 9; then ran his base line into said "cove". From that base line, he surveyed oceanward to the point 5.1 feet above zero tide. By fixing a series of these points along the shore, he was enabled to establish the 5.1 foot contour line as well as its coordinates at higher elevations, including that of 12 feet above zero tide. Inasmuch as the 5.1 line contacted the flat rock extending from the promontory into lot 9, at point "S", as shown on map on opposite page, it became necessary for the surveyor to follow along the promontory into the ocean until he reached said common boundary at the point "Y". The bedrock beneath the beach of said lot 9 at said common boundary, is higher than 5.07 feet above said zero tide. With a layer of silt or sand two inches in depth, on said said bedrock, the plane of mean high tide could never intercept the common boundary within the "cove area" or at any point landward of the flat rock which juts from said cliff at the oceanward side of the cove into lot 9. But said bedrock is blanketed with loose sand from the toe of the cliff to the ocean floor. By reason of said sand, the lowest elevation on said common boundary within said cove is eleven feet above zero tide. While wind and wave at times remove sufficient of the sand temporarily to make the elevation of the mean high tide line along said beach vary, yet the lowest level of the sand could not be used as a means of fixing the elevation of the line of mean high tide because the sand removed will be replaced. However, the proof shows that there has been no substantial net change in the topography of said beach in the past 40 years. Upon this basis, the plane of ordinary high tide could not have intersected said common boundary at any point landward from said flat rock and consequently at no point other than that found by the court on the facts above recited and upon the testimony of the court's surveyor, at the end of said promontory in deep water. It is to be further observed that the 5.1 foot contour was computed conservatively as the elevation of the line of ordinary high tide on the beach of lot 9. In most of the bays and harbors along the coast of Southern California, the mean high

tide is established by said geodetic surveys at lower levels than 5.1 feet.†

In view of the history of this beach that this area between the toe of the cliff of lot 8 and the southwesterly boundary

†ELEVATIONS OF MEAN HIGH TIDE ALONG THE COAST.

(Bulletin of the Department of Commerce, U. S. Coast and Geodetic Survey.)

| | feet |
|---|---|
| San Clemente Island | 4.40 |
| Catalina Harbor | 4.50 |
| San Nicholas Islands | 4.20 |
| Santa Barbara Islands | 4.40 |
| Anacapa Island | 4.60 |
| Santa Cruz Islands | 4.30 |
| Santa Rosa Islands | 4.60 |
| San Miguel Islands | 4.50 |
| San Diego Bay (La Playa) | 4.84 |

of lot 9 has been covered with sand in the past, sloping from an elevation of 12 feet or more above zero tide into the ocean floor, it is clear that the line of mean high tide could not have reached said common boundary at any point landward from the point "S" where the 5.1 line intercepts said flat rock. ■ Where there is no evidence tending to prove that there has been a change in the location of the line of mean high tide, it is presumed that no change has occurred within many years. (*Hunt* v. *Barker*, 27 Cal. App. 776 [151 Pac. 165] ; 1 Wigmore on Evidence, 2d ed., 437.) Moreover, where the surface of the bedrock along the coast is above the line of mean high tide, said presumption becomes practically conclusive because the emergence or subsidence of rocky formations is usually so slow as to be imperceptible in the course of centuries. The promontory and its abutting flat rock have stood as they now stand since the coastal uplift following the lower Miocene. They have neither emerged nor subsided and have suffered but slight erosion. Therefore, if the line of mean high tide along the shore southerly from said promontory (lot 8) has varied, such changes were caused solely by the deposition of sand on the area between the toe of the cliff and the line of mean high tide.

In reversing the former judgment, the Supreme Court concluded that the mean high tide line, as of May or June, 1927, was a natural monument; that it fixed the southerly boundary of all these lots; that the evidence did not establish the line of mean high tide as of that date; and that said line will control the measurements found in the contracts. It, therefore, follows that there could have been no change in the

San Diego Municipal Pier......................................5.10
National City ...............................................5.20
Mission Beach Bridge.........................................3.70
Mission Bay Causeway.........................................3.70
La Jolla ...................................................4.50
Newport Bay ................................................4.40
Balboa .....................................................4.49
Newport Landing, Newport Bay.................................4.50
North Lagoon, Newport Bay....................................3.40
Orange County Wharf, Newport Bay.............................4.50
Santa Ana River.............................................2.60
Long Beach Outer Harbor......................................4.60
Los Patos ..................................................4.00
San Pedro ..................................................4.71
Wilmington Inner Harbor......................................4.72

location of said "natural monument" since November, 1926, the date of the survey preceding the sale; that the trial court has properly determined the length of said common boundary to be 581.45 feet; that it thereby established plaintiffs' title to the area between the lateral boundaries of lot 9 and the line of ordinary high tide, which is 5.1 feet above "mean lower low water".

II. The contracts for the sale of lots 8 and 9 referred to a survey map in the following language: "being shown as a part of lot 9, recorded survey map filed in Book 3, pages 16 and 17, records of Orange County". Because of this map, defendants urge that the distances named in the field notes should govern rather than the monuments, in order to ascertain the intention of the parties. Also, because of said map reference, defendants contend that a portion of the land conveyed to Griffith by his contract of May 2, 1927, is taken from defendants by the judgment. But, considering the language used by the common grantor to define said common boundary, there is no doubt that said common boundary, as described in plaintiffs' contract, is the identical line described in the Griffith contract. Unfortunately, in drafting the description of the same line in plaintiffs' contract, after conducting the southeasterly lateral to the "line of ordinary high tide" the third call proceeds: "thence northwesterly along the line of ordinary high tide to a point located 376 feet south . . . from the point of beginning". Notwithstanding said map reference and the exactness of the length of said line, yet, under the law of the case, said common boundary extended to the line of mean high tide..

Moreover, if it had been the intention to sell lot 9 "as shown on the map" the bank trustee would never have gone to the pains of describing the parcel with such meticulous care by extending the southerly lateral to the line of mean high tide and then northwesterly "along the line of ordinary high tide". But the map reference contention was neatly disposed of on the former appeal when the Supreme Court said, at page 441:

"The official map was conclusively shown to be inaccurate as to the location of the tide line and, in this behalf, it was entirely disregarded by the expert appointed by the court. The map, too, was off scale as much as 40 to 50 feet in some of its boundaries and the expert appointed by the court thought that the line here in dispute had that percentage of

error on the map. Even taking the map as accurate, it does not purport to measure said distance either at 376 feet to the one point or 382 feet to the other. The measurements are given as exact only to the ocean bluff and the measurements from that point to the line of ordinary or mean high tide are only approximations. The engineer who made the survey was examined as a witness and his field-notes were placed in the record. He frankly admitted that the measurements, as the notes show, were only approximations from the bluff line to the tide line. In fact, he said that they were estimates made with the eye only, said observations being made from the top of the bluff overlooking the ocean. No measurements with chains or instruments were made and there was no effort to locate the tide line as of that day in any manner whatsoever. As already noted, this survey was as of November 15, 1926. These parties made their purchases in said subdivision in May and June, 1927. The court found that the line of ordinary high tide had not changed during this period. Yet the survey of one Peabody, made December 22, 1928, indicates that said line of ordinary high tide met the northwest boundary of lot 9 at a distance of approximately 415 feet from the point of beginning, or some 39 feet beyond the point found by the court as of June, 1927. It is strange that no sand or alluvium was deposited in the first year and that much was deposited in the second. Plaintiffs' witnesses fixed this line, by a survey made November 22, 1928, at 592 feet from point of beginning. Moreover, the pleadings admit that said line was in excess of 376 feet in length when this action was instituted on March 1, 1929. We are, therefore, utterly unable to find any evidence that even tends to support the finding in question or, in fact, any finding as to the location of said tide line previous to the fall of 1928. . . . (2) We, therefore, conclude that the mean high tide line, as of May or June, 1927, was a natural monument, fixing the southerly boundary of all these lots and that no sufficient evidence whatsoever can be found in the record to establish the said line as of that date, if indeed any change at all has occurred in it since then. We further hold that said natural monument will control the measurement found in the contracts and conveyances made.''

But, notwithstanding said positive language, defendants now contend that the doctrine of the law of the case does

not apply; that it never extends beyond the exigencies which demand its application, citing *Taylor* v. *Bunnell*, 211 Cal. 601 [296 Pac. 288]; *Klauber* v. *San Diego Street Car Co.*, 98 Cal. 105 [32 Pac. 876]; *Coats* v. *General Motors*,* (Cal. App.) [64 Pac. (2d) 1168]; that said doctrine does not apply to points not actually presented on the first appeal (citing *Trower* v. *San Francisco*, 157 Cal. 762 [109 Pac. 617]; *People* v. *Hamilton*, 103 Cal. 488 [37 Pac. 627]); that it never applies when the evidence is substantially different on the second appeal (citing *Sheets* v. *Southern Pacific Co.*, 1 Cal. (2d) 408, at 411 [35 Pac. (2d) 121]; *Smellie* v. *Southern Pacific Co.*, 128 Cal. App. 567 [18 Pac. (2d) 97, 19 Pac. (2d) 982]; *Erlin* v. *National Union Fire Ins. Co.*, 7 Cal. (2d) 547 [61 Pac. (2d) 756]) and that the doctrine involves procedure not jurisdiction and should not be adhered to when its application results in a manifestly unjust decision. (Citing *England* v. *Hospital of Good Samaritan*, 14 Cal. (2d) 791, at 795 [97 Pac. (2d) 813].

The authorities cited are not in point. The opinion of the Supreme Court is the law of the case. The points determined in the former appeal are the points now under consideration and, therefore, said conclusions must be accepted as final on the retrial. (2 Cal. Jur. 1043.) Where a dispute as to the location of a mining claim was decided in favor of the defendants, the Supreme Court, on remanding the case for a new trial, held that the extent of the claim should be determined by the extent of the occupancy. On a retrial, the lower court committed error in refusing to instruct the jury in accordance with the Supreme Court's pronouncement. (*Table Mountain Tunnel Co.* v. *Stranahan*, 21 Cal. 548.) It was later held "the doctrine of the law of the case is this: that where, upon an appeal, the supreme court . . . states . . . a principle or rule necessary to the decision, that principle or rule becomes the law of the case and must be adhered to throughout its subsequent progress . . . although in its subsequent consideration this court may be clearly of the opinion that the former decision is erroneous in that particular. . . . " (*Tally* v. *Ganahl*, 151 Cal. 418, at 421 [90 Pac. 1049].) It was a matter properly presented to the court for decision and one whose decision was proper as a guide to the

---

*In the case of *Coats* v. *General Motors*, the Supreme Court granted a hearing on March 25, 1937, and the final opinion of the Supreme Court, rendered on July 27, 1938, is reported in 11 Cal. (2d) 601.

court below on a new trial. (*Westerfeld* v. *New York Life Ins. Co.*, 157 Cal. 339, at 345 [107 Pac. 699].)

The application of the doctrine of the law of the case is not to be obviated here because new and additional evidence was received upon the second trial. Such evidence did not alter the issues as originally presented but merely added to the recorded evidence which was indicated by the Supreme Court as necessary to a proper decision of the case. It has been held that additional evidence, merely accumulative to evidence of the same class, received at the first trial and considered on the first appeal, does not interfere with the doctrine of the law of the case; but, on the other hand, to avoid application of the doctrine, a new and substantial fact must be brought into the case upon the retrial. (*Estate of Baird*, 193 Cal. 225, 244 [223 Pac. 974].)

III. The third contention is that the phrase "line of ordinary high tide" should have been given its commonly accepted rather than its technical meaning, that is to say, the line reached by the wash of the waves in unusual storms. If such were the law, the line of ordinary high tide might be fixed at the toe of the cliff where, during the most violent storms, without doubt, the surf beats with fury. But there is nothing in all the negotiations of the parties to indicate that such was the intention. This claim was disposed of by the Supreme Court in its declaration "that the mean high tide line as of May or June, 1927, was a natural monument fixing the southerly boundary of all these lots" etc. " . . . there is no dispute as to the significance of the expression of ordinary high tide. . . . it is not the limit to which we refer when we speak of 'usual' or 'ordinary' high water mark". (*Forgeus* v. *City and County of Santa Cruz*, 24 Cal. App. 193 [140 Pac. 1092].)

While a contract may be explained by reference to the circumstances under which it was made (Civ. Code, sec. 1647) and although the language of a writing is to be interpreted according to the meaning it bears in the place of its execution (Code Civ. Proc., sec. 1857) yet there appears no reason for resorting to the rule of either code section or to the evidence of provincial misuse of a phrase in order to derive the significance of "ordinary high tide line" as used by said common grantor. If these words are understood in their ordinary and popular sense (Civ. Code, sec. 1644)

there can be no doubt as to their meaning in any other sense. To accept the definition of the phrase as given by some witnesses that it meant "the line on the sandy beach to which the wash of the waves came" were as contrary to reason as to say that the average high water of the Mississippi is the line out in the valley reached by flood waters after a season's severest floods. Before physical geography and other scientific knowledge became widely read and literacy so universal, it might have been proper to prove the meaning of "ordinary high tide" in a remote community. But, with universal education and daily press comments concerning the tides and their ebb and flow, it is not reasonable to believe that in the year 1927 officers of a great bank in an enlightened community on the sea coast, carrying a subdivision tract of beach lots for sale could have entertained the thought that the line of ordinary high tide meant the line made by the wash of the waves. One of the earliest lessons in natural science is that the moon pulls the water of the ocean; that where the pull occurs near the shore of a continent the rise of the water on the shore under the lunar force is the flow of the tide, and when it reaches the line of high tide, the force of the pull has been spent and the tide ebbs to sea level and to lower low water again.

The facts that the pull of the moon along the California coast is stronger on some days than on others, and that the combined force of the sun and the moon at other times draws the tide to a still higher elevation than does the moon alone, does not avoid the conclusion that there is a mean or ordinary high tide which may be determined with a fair degree of accuracy, by a method of utilizing the data referred to in the "Tidal Bench Marks" along the coast of Southern California. Suffice it to say that the easy availability of said data renders unnecessary proof of the meaning of the phrase "ordinary high tide" in the vicinity of Laguna Beach.

IV. Defendants argue that reference to the line of ordinary high tide was inserted by conjecture or mistake, and that giving precedence to this reference rather than to the distances named in the calls of the survey produces an absurd result. But, it is the rule that natural boundaries and monuments take precedence over courses and distances contained in a description. (*Hunt* v. *Barker, supra; Swarzwald* v. *Cooley, supra.*) It is more likely that the result

would be absurd if preference were given to distances. The second call in the description in plaintiffs' contract, to wit: "thence southerly 59 degrees, 21 minutes, 30 seconds more or less to a point in the line of ordinary high tide of the Pacific Ocean" shows that one lateral bounding said lot 9 goes definitely to a point "in the line of ordinary high tide".

The third call in the description "thence northwesterly along the line of ordinary high tide to a point located 376 feet south 59 degrees, 21 minutes, 30 seconds west from the point of beginning" omitted, surely through an inadvertence, to have the figures followed by the words "more or less". Had that phrase been inserted as it was in defining said point on the common boundary in the Griffith contract, it is unlikely that any question as to the intention of the common grantor to extend said common boundary to the line of mean high tide would have arisen. But, inasmuch as the southwesterly boundary of lot 9 continued northwesterly along the line of ordinary high tide, no fair construction could draw the line of ordinary high tide to said point at 376 feet from the highway as we have already shown. In the case of *Ferris* v. *Coover,* 10 Cal. 589, at 628, the court said: " . . . the lines actually intended by the parties, if they can be ascertained, are to control. The rules adopted in the construction of boundaries, are those which will best enable the Courts to ascertain the intention of the parties. Thus, preference is given to monuments, because they are least liable to mistake."

The instant case proves the wisdom of said rule. Defendants cited the case of *Goss* v. *Golinsky,* 12 Cal. App. 71, at 74 [106 Pac. 604], to the effect that where monuments are called for by conjecture and not by actual running out of the lines upon the ground, course and distance should govern. But the line of mean high tide was not an imaginary line. The court there said: "If the only question were the relative importance of natural objects or monuments clearly identified and courses or distances, the former would be entitled to precedence . . . 'courses and distances . . . control incidental calls for monuments except where there is a clear intention shown to make such calls locative. . . . ' The calls for these natural objects are intermediate and apparently incidental calls." The call to the line of ordinary high tide

in plaintiff's contract was not incidental or intermediate. It was sacramental to the contract. Plaintiffs were buying a private beach which meant a lot leading to the water's edge. While it is true that the line reached by the tide varies on the beach from day to day, the line of ordinary high tide has remained as constant as the coast itself.

The case of *Miller* v. *Grunsky*, 141 Cal. 441 [66 Pac. 858, 75 Pac. 48], also relied upon by defendants, was an action brought by plaintiff to quiet title to the west 20 chains of section 31, etc., in a certain township in Merced County. The description contained the call "thence west 6.5 chs. to the Orestimba Rancho". That description started from a definite point and extended exactly 6½ chains to a natural monument, the Orestimba rancho. The plaintiff failed in that case because he did not show the location of said ranch to be at any definite place whereas the defendants demonstrated that the ranch was 6½ chains from the known point.

In the description contained in the contracts for the sale of lots 8 and 9, there is but one monument, to wit, the line of mean high tide of the Pacific Ocean. The call to that monument was for the purpose of establishing the southwesterly boundary of the lots sold in each case. Defendant's contention is that said reference to the map in the contract shows definitely that lot 9 extended only 376 feet from the state highway along said common boundary and that, therefore, said map reference should control. But upon the former appeal, the official map was held to be inaccurate as to the location of the line of mean high tide. Even taking the map as accurate, it does not purport to measure said distance either at 376 feet on the northwest lateral or 382 feet on the southeast lateral. The measurements are given accurately only to a point near the top of the cliff and the measurements from that point to the line of mean high tide are only approximates. There was no reason why he should, for it was an unchangeable monument without value except in case of dispute as to the length of the lateral boundaries.

The rule obtaining in this jurisdiction with reference to the precedence of references is set forth in 4 California Jurisprudence, 394, as follows: "where maps, plats or field notes are referred to in a description of the property, they are to be regarded as incorporated in the description and a part of it. In case of a conflict between the calls of the field

notes and the calls of a survey, *the calls of the field notes will prevail.* Particularly where the calls of the field notes are for monuments and the calls of the survey are by course and distance. . . . In case of a discrepancy between field notes and a plat, the plat must give way to the field notes; and a plat may be corrected so as to conform thereto, and if corrected, such plat supersedes the original.'' (*Harrington* v. *Boehmer,* 134 Cal. 196 [66 Pac. 214, 489]; *Tognazzini* v. *Morganti,* 84 Cal. 159 [23 Pac. 1085].) From the foregoing consideration, therefore, we cannot avoid the conclusion that the correct construction of the description of lot 9 as contained in the contract of sale to the plaintiffs is that the plaintiffs' southeasterly line extends to mean high tide and that the westerly boundary of said lot extends ''along the line of ordinary high tide'' to its intersection with the common boundary of lots 8 and 9 at the end of the promontory.

V. Defendants contend that the original sale of lot 8 carried with it an easement by implication of access to the water across the beach in front of lot 9 and that plaintiffs took subject thereto; that when the common grantor sold lots 7 and 8 to Griffith and retained lot 9, an easement was vested in Griffith and his successors whereby the right to cross over the common boundary between lots 8 and 9 to reach the water was vested in Griffith at the time of his purchase. They base this contention either upon the claim that there was a well defined and obvious trail from lot 8 to the water in front of lot 9 or because the lots were sold with reference to a recorded map. In support of these contentions, the defendants cite *Cave* v. *Crafts,* 53 Cal. 135; sec. 1104, Civ. Code; *Silveira* v. *Smith,* 198 Cal. 510 [246 Pac. 58]; *Vargas* v. *Maderos,* 191 Cal. 1 [214 Pac. 849]; *Cheda* v. *Bodkin,* 173 Cal. 7 [158 Pac. 1025]; *Jersey Farm Co.* v. *Atlanta Realty Co.,* 164 Cal. 412 [129 Pac. 593]. These authorities definitely establish the rule above recited but, by reason of the facts of the instant case, the rule supported by said authorities is not applicable for the reasons that: (1) The evidence in support of the easement is insufficient, and (2) the theory of an easement is raised for the first time upon this appeal.

In order for an easement to arise by implication, it must be both apparent and continuous, or obvious and permanent. (Civ. Code, sec. 1104.) An easement which is apparent and continuous will pass as appurtenant without the

use of the word "appurtenances"; but if it is not apparent and continuous, it is not included in the conveyance unless the grantor uses language in his deed sufficient to create the easement *de novo*. (19 Cor. Jur. 917.) ▉ An apparent or obvious easement is one that is visible on the servient estate. It sometimes refers to an artificial or permanent structure on the servient estate.

"Many authorities declare that the word 'apparent' as applied to an easement in this connection does not necessarily mean visible, but refers to an easement used by means of some artificial permanent structure on the servient tenement such as a pipe, sewer or a ditch, as distinguished from those which use the servient tenement in its natural state and at intervals, in the meantime leaving no visible sign of their existence, such as a way or a right of fishery or pasture." (*Rubio Cañon etc. Assn.* v. *Everett*, 154 Cal. 29 [96 Pac. 811].)

From the language above quoted, it appears that to establish an easement by implication, there must be something upon the servient estate which is either visible or in the nature of a permanent artificial structure. But, in the instant case the trial which defendants say created the implied easement existed on lot 8 and not on lot 9. The trial descended down the side of the bluff, within the "cove" and was finally supplanted by a stairway with concrete steps at its base. This concrete base was at the foot of the cliff some 25 feet northwest from the common boundary line between lots 8 and 9. How, then, could the trail down the side of the bluff of lot 8 create an easement to cross lot 9? It could not "create in favor thereof (lot 8) an easement to use other real property (lot 9) of the person (plaintiffs) whose estate is transferred". (Civ. Code, sec. 1104.) Upon no fair construction of the facts as they existed, as shown by the exhibits in this case, could it be reasonably claimed that a person who purchased lot 9 in quest of a private beach be said to have had notice that a trail leading down the bluff of lot 8 onto an inaccessible portion of the same lot should be construed to imply a right to pass over lot 9 in order to reach the ocean.

▉ Defendants further contend that the map referred to in the Griffith contract of purchase and in the subsequent deed from a common grantor became a part of the deed and

that the map shows that said common boundary ran "across the beach in the cove" and that, therefore, a private easement for access to the water is analogous to an easement acquired under such circumstances for access to a highway. (*Danielson* v. *Sykes*, 157 Cal. 686 [109 Pac. 87, 28 L. R. A. (N. S.) 1024]; 45 Cor. Jur. 500.) But, if the common boundary line did run across the beach in the cove, this fact would not have conveyed to defendants the right to cross over into lot 9, but merely that they had access to the water fronting upon lot 8. This conclusion is emphasized by the fact that the status of this coastal area was altered, prior to the sales in question; it had been subdivided into lots, each apparently for the private use of one family. "Except where the grant under which the land is held indicates a different intent, the owner of the upland, when it borders on tidewater, takes to ordinary high water mark." (Sec. 830, Civ. Code.)

Finally, the contention that an easement arises by implication could not under any circumstances prevail for the reason that this contention is raised for the first time upon this appeal. Plaintiffs challenge the record to show that any theory was advanced or argument made to the effect that an implied easement to use the sands of lot 9 in order to reach the ocean was never mentioned at any point in the course of the trial. We have been unable to find such argument. The pleadings and the briefs and the conduct of the trial indicate that the theory of the defendants at the trial was that title was vested in them in that portion of lot 9 which lay between a point 376 feet from the highway to the line of mean high tide. It is true that the court made a finding "that said parties mutually believed that 376 feet more or less was to a point in the high tide or ordinary high tide line of the Pacific Ocean" and "said parties did mutually believe that by reason thereof Raymond Griffith did own all of the land projecting into the sea beyond said northwesterly boundary of said lot 9 as ended by 376 feet, more or less, and that said Raymond Griffith would have free access to the Pacific Ocean from the southeasterly boundary of said lot 8 . . . and would have free access to the Pacific Ocean over lands southwesterly of the said 376 feet as ended by the ordinary high water mark, or high tide water mark, or shore line, the northwesterly boundary of said lot 9 as marking the ordinary high tide of the Pacific Ocean". But those

findings were responsive to the allegations of the second count in the cross-complaint of the defendants drawn on the theory of title. The language last quoted indicates that Griffith believed he would have access over the property which he thought he owned and the language does not indicate that he thought he had access to the waters over the property of plaintiffs.

The judgment is affirmed.

Wood, J., and McComb, J., concurred.