[Civ. No. 21296. Second Dist., Div. Three. June 14, 1956.]

VINCENT C. PEET et al., Appellants, v. JOSEPH G. SCHURTER, Respondent.

Vincent C. Peet and Elizabeth D. Peet, in pro. per., for Appellants.

Joseph G. Schurter, in pro. per., for Respondent.

WOOD (Parker), J.—Plaintiffs sought a declaration of their rights with respect to the use of an irrigation pipe which is upon defendant's land. (The pipe also extends across plaintiffs' land.) Plaintiffs appeal from judgment in favor of defendant.

Prior to 1945 Mr. and Mrs. Downing owned land known as Lots 5 and 12—each lot containing 10 acres. Lot 5 was north of and adjacent to Lot 12. A water meter was on the northwest corner of Lot 5. A 6-inch irrigation pipe extended east from the meter along the north line of Lot 5 to the approximate center of that line, and then the pipe extended south, in the approximate center of Lot 5, across Lot 5 and onto Lot 12. That pipeline and lateral pipes attached thereto constituted an irrigation system for both lots. Lot 5 is bounded on the north by Chatsworth Street, and both lots are bounded on the east by Mason Avenue. (When the lots were sold by the Downings, as hereinafter stated, there was no irrigation pipe in the part of Mason Avenue which is east of the lots, but there was an irrigation pipe in Mason Avenue south of the south boundary line of Lot 12. In other words, before said sales by the Downings, there was no irrigation pipe in Mason Avenue north of the south boundary of Lot 12.)

In 1945 or 1946 the Downings sold Lot 12 to Mr. Olms.

In 1946 the Downings sold the south half of Lot 5 to Mr. and Mrs. Einboden. In connection with that sale Mr. Einboden and Mr. Downing entered into a written agreement which provided in part as follows: "We, the undersigned hereby

agree to the following in connection with the sale and purchase of 5 acres ranch on Mason Avenue, Chatsworth, for which the sale has been placed this day [March 29, 1946] in the Security-First National Bank of Los Angeles: . . . . The buyer agrees to allow the owner of the ten acres on the South to use the water from the #23484 meter for irrigation of said land, by permitting passage of said irrigation line over said buyer's land as heretofore.'' The ''owner of the ten acres on the South,'' so referred to, was Mr. Olms. The meter, so referred to, was the meter on the northwest corner of Lot 5. The agreement was not recorded.

In April, 1949, the Einbodens sold the south half of Lot 5 to the plaintiffs. The deed in said transaction did not contain any reference to said written agreement between Mr. Einboden and Mr. Downing, or any reference to use of the irrigation pipe on the south half of Lot 5 by the owner of Lot 12.

Mr. Downing testified that during the time he was negotiating with Mr. Einboden for the sale of the south half of Lot 5, he told Einboden that until the war was over a water main would not be put on Mason Avenue (east of the two lots), and that until such time as Lot 12 discontinued the use of the meter he (Downing) had agreed, upon the sale of Lot 12 to Olms, to allow Olms to use the meter to serve his property, and he (Downing) wanted Einboden to sign an agreement to allow water to pass through (the pipe on Einboden's land) and serve Lot 12; and that he also told Einboden that he could have a temporary use of the irrigation pipe (which extended from the meter and across Downing's land) until the water became available on Mason Avenue. Mr. Downing also testified that the Department of Water and Power had informed him that eventually it was going to install a water main on Mason Avenue from the ''stopping point'' near the south boundary of Lot 12 up to Chatsworth Street.

In December, 1951, an 8-inch water main was installed on Mason Avenue, east of the two lots, that is, the water main was extended on Mason Avenue from the south boundary of Lot 12 to Chatsworth Street.

Mr. Olms divided Lot 12 into four parcels and sold the parcels to certain persons, who discontinued use of the irrigation line on Lot 5, and who connected irrigation pipes on their parcels with the water main on Mason Avenue.

In 1953 the Downings sold the northwest quarter (2½ acres) of Lot 5 to defendant.

The Downings sold the northeast quarter of Lot 5 to Dr.

Boak. (The date of the sale is not shown.) A separate meter and separate irrigation system, installed on this parcel, were connected with the water main on Chatsworth Street.

It thus appears that all the parcels into which the two lots had been divided (four parcels on Lot 12 and three parcels on Lot 5), except the parcel owned by plaintiffs, have separate meters and are now connected to water mains on Mason Avenue or Chatsworth Street. Plaintiffs have not installed a meter on their parcel or made a connection with the water main on Mason Avenue.

Plaintiffs (appellants) contend that they are entitled to continue to use the meter and the irrigation pipe which are on defendant's land. They argue that the agreement between Downing and Einboden guaranteed the continued right to use the irrigation pipe which was on defendant's land; that no restriction on the use of the pipe is mentioned in said agreement or in the deed from the Downings to the Einbodens, and by reason of the deed the right of plaintiffs to the continued use of the pipe became an implied easement; that the implied easement was transferred by the deed of the Einbodens to plaintiffs as an "incident appurtenant" to the land so conveyed; that plaintiffs have a prescriptive right to the continued use of the pipe on defendant's land; that Downing and Einboden are estopped by said agreement and their grant deeds to testify that they orally modified the agreement; that certain findings of fact are against the evidence and the law; and "the conflict of evidence with the facts" show the conclusions to be "unacceptable to reasonable minds."

Some of the findings of the court were: The Downings, upon dividing and selling Lots 12 and 5, orally advised each of their grantees that they would be permitted to receive water for irrigation through the 6-inch main which ran across Lot 5 and onto Lot 12, only until the 8-inch main then laid to the southeast corner of Lot 12 was extended northerly in Mason Avenue to its intersection with Chatsworth Street, and that when the 8-inch main was so extended then the right of the grantees to receive water through the 6-inch main would cease, and all of such grantees who acquired parcels fronting on Mason Avenue would be required to disconnect from the 6-inch main and receive water through the 8-inch main. Plaintiffs' property fronts on Mason Avenue. At the time plaintiffs acquired their property they knew of their right to receive water through the 6-inch main only until water was made available by the extension of the 8-inch main along the

eastern boundary of Lots 12 and 5 along Mason Avenue. Since December, 1951, an 8-inch water main has been in Mason Avenue, extending northerly from the southeast corner of Lot 12 to northeast corner of Lot 5, and has been available for supplying all demands of plaintiffs for irrigation purposes. Subsequent to December, 1951, defendant has demanded that plaintiffs disconnect the 6-inch main at the boundary between plaintiffs' and defendant's land, and discontinue the use thereof, and has demanded that plaintiffs connect with the 8-inch main in Mason Avenue. Plaintiffs have refused to comply with the demand, and they claim an easement across defendant's land to maintain the 6-inch main and to continue to receive water therefrom.

Some of the conclusions of law were: Plaintiffs have no right or interest in defendant's land or to any portion of the 6-inch water main or water system lying within the boundaries of defendant's land, except that plaintiffs shall have the right to continue to receive water for irrigation purposes through the 6-inch main across defendant's land to and including August 1, 1955. The judgment was in accordance with the conclusions of law.

Whether or not there was an implied easement depended upon the intent of the parties. ▇ In *Fristoe* v. *Drapeau,* 35 Cal.2d 5 [215 P.2d 729], it was said at page 8: "The purpose of the doctrine of implied easements is to give effect to the actual intent of the parties as shown by all the facts and circumstances." ▇ It was also said therein at page 9: "The effect of section 806 [Civil Code] is to establish intent as the criterion, and this is in accord with the rationale of the rules governing easements by implication." ▇ In *Mosier* v. *Mead,* 45 Cal.2d 629 [290 P.2d 495], it was said at pages 632-633: "Whether an easement arises by implication depends on the intent of the parties, and the court will take into consideration the circumstances attending the transaction, the particular situation of the parties, and the state of the thing granted." ▇ In *Orr* v. *Kirk,* 100 Cal.App.2d 678 [224 P.2d 71], it was said (p. 681) that the intent of the parties to create an easement by implication "must clearly appear in order to sustain an easement by implication." In this last cited case, the question was whether the evidence was sufficient to support the findings and judgment that there was no implied easement. The trial court therein permitted testimony that there was no conversation to the effect that plaintiff could or could not use the driveway; and that

the use of the driveway was a neighborly accommodation. The judgment therein was affirmed. In *Rischall* v. *Bauchmann* (1946), 132 Conn. 637 [46 A.2d 898, 902, 165 A.L.R. 559, 565], it was said (p. 645) that, "[I]n determining whether an easement by implication exists, statements by the grantor to the grantee made prior to the consummation of the transaction to the effect that a license and not an easement is to pass by the conveyance are admissible." ■ In the present case, it was not error to receive testimony as to the intent of the parties.

■ On appeal the evidence is to be viewed in the light favorable to respondent.

■ The finding to the effect that the Downings, upon selling the south half of Lot 5 to Einbodens, advised the Einbodens that they would be permitted to have temporary use of the water main on the north half of Lot 5 is supported by the evidence. There was testimony by Mr. Downing as above shown, to the effect that he told Einboden, prior to the sale to Einboden, that until the war was over a water meter could not be put on Mason Avenue, and that Einboden could have temporary use of the pipe and meter on Downing's land until water was available on Mason Avenue.

■ Also, the finding to the effect that when plaintiffs acquired their property they knew that their right to use the pipe on the Downings' land was temporary is supported by the evidence. Mr. Downing testified that when Mr. Peet bought the property he (Downing) told him how to operate the valve and "it was a temporary use until such time as the main was put on Mason Street."; that he (Downing) could not say whether he said that to Mr. Peet before or after Mr. Peet acquired title to the property because he did not know whether he saw Mr. Peet before or after the purchase, but he did know that he discussed the temporary use with him as soon as he (Downing) knew Mr. Peet was there; that Mr. Peet said he had not known anything about it; about 1951, after the main was on Mason Avenue, they (Downing and Peet) discussed Peet's discontinuance of use of the line on Downing's land, and Downing suggested that Peet could install a meter and connect with the line on Mason Avenue; Peet said that if Downing would grant him a year he would then be financially able to swing the deal; they decided to wait a year, and they came to an understanding that Peet would use the line on Saturdays and Sundays, and Downing would use it during the week so there would be less confusion;

in 1952, when the year was about over, Mr. Peet said that he was short of funds again and he would not be able to disconnect the line; Downing then said that he would be forced to extend the time; the cost of the meter and line would be about $450; Mr. Peet did not at any time state that he had a right to continue using the line across Downing's land and that he was not going to connect with the line on Mason Avenue.

Mr. Peet testified that before he bought the land he was aware of the location of the irrigation system and that the water main came across the north half of Lot 5, that Einboden told him that the system went with the property; he (Peet) knew that in order to service his property from the main on the north half of Lot 5 the main would have to be maintained (in repair) on his neighbor's land, and he assumed that it would be to his neighbor's advantage to continue keeping it in good repair; he (Peet) did not recall meeting Downing until after the purchase of the land; in 1951, about two years after Peet had purchased the land, Downing requested him to change the irrigation line to Mason Avenue; Peet replied that, as a neighbor, he would consider it; then they discussed the cost, and when he found that he could not afford it he dismissed it from his mind; he estimated the cost between $800 and $1,000; Downing did not tell him that the right to use the pipe was temporary, but he did intimate, in 1952 when Peet refused to change to Mason Avenue, that the right was temporary.

Defendant Schurter testified that when he purchased the north half of Lot 5 Downing told him that Peet had agreed to discontinue the use of the line on defendant's land but he (Peet) was financially unable to connect with the Mason Avenue line; defendant had discussions with Peet about changing to the Mason Avenue line, and Peet said that he would check into the cost of the connection, and he asked defendant for more time to make the change because he was having trouble raising the money; in December, 1953, Peet said that the cost would be $450, and he did not have the money then; defendant told him that he (Peet) could not use the line any more, and Peet replied that he could do nothing about the line at that time; Mrs. Peet then said they would do nothing until they received notice in writing; on May 14, 1954, defendant delivered a writing to them to the effect that he intended to cut the pipeline on his land and stop the flow of water onto plaintiffs' land.

It was a question of fact for the determination of the trial court as to whether plaintiffs bought the land with notice that right to use the pipe on defendant's land was temporary.

A further contention of appellant, as above stated, is that they have a prescriptive right to use the pipe which is on defendant's land. ██ "A prescriptive right to an easement over the land of another may be acquired only by clear evidence of adverse use, openly, notoriously, and continuously asserted for the statutory period of 5 years." (17 Cal.Jur.2d 117, § 18.) ██ Plaintiffs used the pipeline, which is on the north half of Lot 5, from the time they purchased the land in April, 1949, until the filing of their complaint herein on June 4, 1954 (and thereafter), a period of more than five years. According to the findings, which as above stated are supported by the evidence, the use by plaintiffs of that pipeline, until an irrigation pipe was placed in Mason Avenue in December, 1951, was with the permission of the owner of the north half of Lot 5. There was evidence that after the Mason Avenue pipe was installed the owner of the north half of Lot 5 gave plaintiffs further permission to use the pipe on the north half of Lot 5 for a further period of more than a year. There was no finding, however, with respect to further permission for the time after the Mason Avenue pipe was installed. In any event if there was adverse use by plaintiffs of the pipe, it was after December, 1951, and therefore, at most, the period of such adverse use would be about two and one-half years. Plaintiffs did not have a prescriptive right to use the pipeline which is on the north half of Lot 5.

The judgment is affirmed.

Shinn, P. J., and Vallée, J., concurred.

A petition for a rehearing was denied July 11, 1956, and appellants' petition for a hearing by the Supreme Court was denied August 8, 1956.