[Civ. No. 17376.   First Dist., Div. One.   June 20, 1958.]

HORACE O. WARFIELD, Appellant, v. VLADIMIR R. BASICH et al., Respondents.

Melvin Cohen, Albert Picard, Burton M. Greenberg and George Olshausen for Appellant.

Barfield & Barfield for Respondents.

BRAY, J.—Plaintiff sued to quiet title to certain alleged easements over defendants' property. Defendants cross-complained to quiet title against plaintiff's claims. Plaintiff appeals from the judgment in favor of defendants.

### QUESTION PRESENTED[1]

Does the evidence establish an implied easement for ingress and egress over defendants' land to plaintiff's land?

### EVIDENCE

Both plaintiff's lot and that of defendants' originally belonged to one Bibbero. In 1911 he caused a four flat building to be erected on the lot now belonging to plaintiff. It bore four numbers, one of which was 2961. It had no garage but a large basement. It had a tradesmen's entrance which was closed off in 1913. In 1937 it was converted into a guest house and bears the common number 2961. In 1913 on the lot now owned by defendants Bibbero constructed a two flat building commonly known as 2949.[2] It had a large garage entranceway and also a tradesmen's entrance. There is no common wall between the buildings. When Bibbero constructed the flats on defendants'

---

[1]The complaint contains four alleged causes of action: (1) rights through conveyance from a common grantor; (2) rights through prescription; (3) rights through implied easement; (4) rights through easement of necessity. At oral argument plaintiff, by stipulation, abandoned counts 1, 2 and 4, and also claims to any rights other than those of ingress and egress and use of garage.

[2]For clarity the 2961 property will be referred to as plaintiff's lot, and the 2949 property as defendants' lot.

lot, sufficient excavation was made so that the basement of plaintiff's lot could be used as a garage. Fire doors were put between the openings in the basement so that the opening could be closed if so desired in the future. At the same time the tradesmen's entrance into plaintiff's lot was closed but left so that it could be reopened. Bibbero owned both lots until 1942, düring all of which time the tradesmen's entrance and the garage entrance of defendants' lot was used to get into plaintiff's lot. A turntable had been constructed on defendants' lot to enable cars to get into plaintiff's garage. The hot water and heat system were on defendants' lot and ran into plaintiff's. Each lot, however, had its own sewer to the street. In 1942, Max de Hess purchased both lots and kept them for approximately two years, during which time he leased them separately. During that time the tenants of both lots used the entranceway on defendants' lot and the garage on plaintiff's lot. The last persons to own both lots at once were Sam Sankowich and his wife. They only held the properties for a short time, selling August 31, 1944, plaintiff's lot to Rosa Aston and defendants' lot on November 13th to Mary Glenn.

Rosa Aston in 1933 had leased one of the flats on plaintiff's lots from Bibbero. When Bibbero converted the building into one unit she leased it and operated it as a guest house, continuing to lease it from the subsequent owners until 1944 when she purchased it from the Sankowiches. Her leases from the successive owners contained provisions covering the use by her and her tenants of the garageway, turntable and tradesmen's entrance. Heat and water was also provided for, she paying two-thirds of the cost. She also paid a sum for maintenance of the garage, and was given four stalls in the garage on the property she was leasing.

One Hutton who leased defendants' lot from 1939-1945 testified that to the best of his recollection there were no provisions in his lease regarding the garage or entranceway. He used the entranceway and turntable to park his car in the garage on plaintiff's lot, under some understanding with Bibbero, his first lessor.

The deed by which Mrs. Aston purchased plaintiff's lot from the Sankowiches is dated August 31, 1944, acknowledged September 5th, and recorded September 6th. On September 1st she entered into an agreement with Sam Sankowich which, in addition to covering the supplying of heat and hot water to her property (plaintiff's lot) from the facilities on defendants' lot, stated that it was agreed that the entrance, exit

and turntable should be available at all times to both parties and their tenants and that Sankowich should be allotted sufficient space to garage four automobiles, as well as for entrance and exit to tradespeople serving either building.[3] Mrs. Aston was to bear two-thirds of the cost of repair or maintenance of the turntable during the term of the agreement, which was to run from September 1, 1944, to August 31, 1947. When Mary Glenn purchased defendants' lot from Sankowich he assigned this agreement to her. Before its expiration, Miss Glenn and Mrs. Aston entered into a similar agreement for a term ending August 31, 1950.[4]

In December, 1946, Mrs. Aston hired plaintiff to manage her guest house. In January, 1948, she sold the lot to plaintiff and assigned to him her agreement with Miss Glenn. About nine months later, concluding that it would be more economical to install his own hot water and heating system, he notified Miss Glenn that he would terminate the agreement as of November 22, 1948. She consented.

In November, 1954, defendants purchased their lot from Miss Glenn. Shortly thereafter plaintiff asked to rent some of the stall place used by defendants in the garage. Defendants refused, stating that they were going to reconstruct the garage. Plaintiff stated that he had an easement in the garage and they could not reconstruct. Thereupon defendants wrote plaintiff informing him that defendants intended to close the wall between the properties and giving him 60 days to make other arrangements.

---

[3]This portion of the agreement was preceded by the following clauses: ''In addition to the above agreement as to heat and hot water service, it is further agreed as regards the operation for joint use of garage and the entrance and exit thereto now jointly located in both buildings.

''Inasmuch as the major portion of garage space is in the basement of building of the second party and the entrance and exit as well as turn-table necessary to the operation of the garage is in building owned by first party and is at present jointly used by both parties, it is agreed as follows'':

[4]The language of this agreement varied somewhat from that of which it was a renewal. It stated: ''And the parties hereto do further declare and agree that inasmuch as the major portion of garage space is in the basement of said building of the party of the second part, and the entrance and exit as well as turn-table necessary to the operation of the garage is in the said building of the party of the first part, and is at present jointly used by the parties hereto, it is hereby further agreed and understood between the parties hereto that said entrance and exit, as well as the use of the tun-table [sic] *shall at all times during the term of this agreement* be available to both the first and second party hereto, their respective tenants or persons designated by either for access to or egress from said garage space. . . .'' (Emphasis added.)

The trial court found that the use of the garageway, garage, turntable, tradesmen's entrance and passageway and the pipes on defendants' lot was by way of reciprocal license or oral or written agreement and by consent of defendants and their predecessors; that all agreements have terminated and that no easement existed, and quieted defendants' title as against plaintiff's claims.

## Was There An Implied Easement?

Plaintiff contends that there was. ■ The law of easements by implication is well settled. It is expressed in *Cave* v. *Crafts* (1878), 53 Cal. 135, 139, quoting from *Lampman* v. *Milks,* 21 N.Y. 505: " 'The rule of common law on this subject is well settled. The principle is, that where the owner of two tenements sells one of them, or the owner of an entire estate sells a portion of it, the purchaser takes the tenement or portion sold with all the benefits and burdens that appear at the time of sale to belong to it, as between it and the property which the vendor retains. . . . No easement exists so long as the unity of possession remains, because the owner of the whole may at any time rearrange the quality of the several servitudes; but upon severance by the sale of a part, the right of the owner to redistribute ceases, and easements or servitudes are created corresponding to the benefits or burdens existing at the time of sale.' "

■ "Strict necessity" is not an element of an implied easement in the type of case before this court. (See *Cheda* v. *Bodkin* (1916), 173 Cal. 7 [158 P. 1025]; Restatement, Property, § 476, comment g; Thompson on Real Property, perm. ed. (1939), §§ 502, 503; Tiffany, Real Property, (3d ed.) § 786.) In California all that is needed is that it be proved that the claimed easement is "reasonably necessary to the beneficial enjoyment of the land granted." (*Fischer* v. *Hendler* (1942), 49 Cal.App.2d 319, 322 [121 P.2d 792].)

■ The purpose of the doctrine of implied easements is to give effect to the actual intent of the parties as shown by the facts and circumstances of the case, and whether or not there was an implied easement depends upon the intent of the parties. (*Fristoe* v. *Drapeau* (1950), 35 Cal.2d 5, 8 [215 P.2d 729]; *Peet* v. *Schurter* (1956), 142 Cal.App.2d 237, 242 [298 P.2d 142]; see also Restatement, Property, § 476, comment a.)

■ Necessary for the implied grant of an easement are the following: (1) A separation of title which implies a unity of ownership at some time as the foundation of the right. (2) Be-

fore the separation takes place, the use which gives rise to the easement must have been so long continued and so obvious as to show that it was intended to be permanent. (3) The claimed easement must be reasonably necessary to the beneficial enjoyment of the land granted. (*Fischer* v. *Hendler, supra,* 49 Cal.App.2d at p. 322; *Orr* v. *Kirk* (1950), 100 Cal. App.2d 678, 681 [224 P.2d 71]; *Beem* v. *Reichman* (1918), 36 Cal.App. 258, 263 [171 P. 972].) ▆ An obvious or apparent use is one that is visible on the servient parcel or as sometimes referred to, an artificial or permanent structure on the servient parcel. (*Swarzwald* v. *Cooley* (1940), 39 Cal. App.2d 306, 324-325 [103 P.2d 580].)

There is no doubt that the evidence of the instant case could be said to be sufficient to establish the three elements. However, here the trial court found against the plaintiff in that there was no intent to grant any easement and that the use was by permission and consent. Thus, in order to reverse the judgment, under plaintiff's contention, this court would have to hold that, notwithstanding such a finding, the facts show as a matter of law that plaintiff was entitled to the claimed easement. (See *Orr* v. *Kirk, supra,* 100 Cal.App.2d at pp. 681-682.) In short, it is a fact question. ▆ Moreover, an implication can only be made in connection with a conveyance. (*Idem.*)

▆ In the instant case the implied grant of an easement could only have occurred at the time of the severance from the common owner. That would have been at the time of the conveyance to Mrs. Aston by Sankowich. But the evidence showed that at practically the same time the grantor and grantee entered into a separate agreement covering the same subject matter as the claimed easement. Thus, this is sufficient, notwithstanding the other elements being present, to support a finding that there was no intent to grant an easement. In fact, such an agreement manifested the express intent of the parties and leaves nothing for implication.

Although the deed was dated August 31, 1944, it was not acknowledged until September 5th and recorded September 6th. The agreement is dated September 1st. Obviously the two documents were executed almost simultaneously. Moreover, at the expiration of the term set forth in this agreement, a similar one was executed by the then owner of the two lots. This latter agreement was assigned to plaintiff when he purchased his lot from Mrs. Aston.

▆ Plaintiff contends that the first agreement constituted

an acknowledgment of an easement then existing and merely provided for the apportionment of the cost of the operation of the hot water system and for stalls in the garage. However, this contention overlooks the fact that the agreement was made as a part of the transaction under which the property was first divided and that no implied easement could come into effect when the rights of the parties were being determined by contract. Moreover, that the predecessors in interest of the parties themselves interpreted the rights between the parties to be contractual is clearly demonstrated by the language in the second agreement which definitely stated that "said entrance and exit, as well as the use of the tun-table [sic] shall at all times during the term of this agreement be available to both the first and second party hereto . . ." The limitation to the term of the agreement is completely inconsistent and incompatible with any right by easement.

These facts support, if they do not compel, an inference that plaintiff knew at the time of the purchase that the permitted uses were temporary and by express agreement and not by easement. See *Peet* v. *Schurter, supra*, 142 Cal.App. 2d 237, where the finding of the trial court that there was no implied easement was held to be sufficiently established by evidence that the plaintiff's predecessor in title was advised by the grantor that the use was only temporary and that plaintiff knew of the temporary character of the use at the time of purchase.

Moreover, "The trial judge viewed the premises at the request of the parties. What he observed is not part of the transcript of the record, but it is evidence which this court must assume supports the findings." (*Ng* v. *Warren* (1947), 79 Cal.App.2d 54, 57 [179 P.2d 41]; *Owsley* v. *Hamner* (1951), 36 Cal.2d 710, 719 [227 P.2d 263, 24 A.L.R.2d 112].) (The two cases involved easements by implication.)

And it has also been said that a trial judge's view of premises is evidence which may be used alone or with other evidence to support the findings. (*McCarthy* v. *City of Manhattan Beach* (1953), 41 Cal.2d 879, 889 [264 P.2d 932].)

An implied easement comes into existence where there is a severance of one parcel from another and the parties are silent as to the then use of one of the severed parcels by the other. The law then assumes that the parties would have expressed an intent under the circumstances to continue the one parcel subservient to the other. Here, however, the parties were not silent. They expressed in a written agree-

ment their intentions. Thus, the law may not imply an easement.

The judgment is affirmed.

Peters, P. J., and Wood (Fred B.), J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied August 13, 1958.