[L. A. No. 6023. In Bank.—April 1, 1921.]

FRASER'S MILLION DOLLAR PIER COMPANY (a Corporation), Respondent, v. OCEAN PARK PIER COMPANY (a Corporation), et al., Appellants.

[1] UNLAWFUL DETAINER—LEASE—BREACH OF COVENANT TO PAY TAXES —PLEADING—SUFFICIENCY OF COMPLAINT.—In an action in unlawful detainer, where the complaint alleged an unlawful holding after default upon a covenant by the lessee to pay the taxes assessed against the leased premises followed by a notice to pay the same or quit within three days, which demand was not complied with, the complaint was not open to the objection that it did not state facts sufficient to constitute a cause of action in that there was no allegation that no tax was ever levied upon the leased premises, where it was alleged that the second installment of the taxes levied against the property of the plaintiff, which included the leased property, was a certain amount, and that a certain lesser amount was the proportional amount of said taxes chargeable against the leased premises.

[2] ID.—EVIDENCE—TAX APPORTIONED TO LEASED PREMISES—ADMISSIBILITY OF TESTIMONY OF ASSESSOR. — In an action to recover leased premises on the ground of breach of covenant of a lease to pay taxes on the demised premises which were a part of a

larger tract, the assessment being made of the larger tract as a whole, testimony of the county and city assessors, who made the respective assessments, was admissible to show the proportion of the taxes properly chargeable to the leased premises.

[3] Appeal—Findings—Conflicting Evidence.—Where the evidence is conflicting upon an issue a finding based upon it is conclusive in the appellate court.

[4] Unlawful Detainer — Breach of Covenant to Pay Taxes — Amount of Tax—Account Stated.—In an action of unlawful detainer to recover premises on account of breach of a covenant to pay taxes in a lease of the premises, the leased premises being a part of a larger tract which was assessed as a whole, where it was the custom of the lessor to make up a statement of the amount of taxes properly chargeable to the lessee and render such statement showing the amount due for each installment of taxes, which the lessee would pay as the tax fell due, the statement was in the nature of a stated account, and where this course was followed as to the taxes in question, no objection having been made to the statement and the lessee having paid the first installment without objection as to the amount and no objection having been made to the amount demanded for the second installment until after suit brought, the circumstances must be taken as an admission by the lessee that the amount charged was fair and just and it is sufficient to support a finding to that effect.

[5] Tide-lands—Boundaries.—The rights of adjoining owners of land bordering upon tide water, or upon a navigable lake or stream, in the land under the water upon which both tracts abut, and to the use of the water covering the same, are not fixed by extending their boundary line in the direction of the last course ending at the shore line, but are fixed by a line drawn into the water perpendicular to the shore line; that is, to the general course of the shore line at that point. If the shore line is circular, it will be perpendicular to a tangent drawn on the circle at the point of such intersection. The same rule applies, in the absence of any statute to the contrary, to the bounds of municipal jurisdiction over waters of the ocean.

[6] Leases — Covenant to Pay Taxes and Rent Independent — Waiver.—Where a lease provides that the lessee shall pay the taxes on the demised property and that in case he fails to do so for any year or any installment thereof and the lessor thereupon pays them, the amount thereof chargeable to the lessee must be paid to the lessor at the next rent day thereafter, the covenant to pay the taxes and that to pay the rent are wholly separate and independent and the acceptance of the rent does not operate as a waiver of the obligation to pay the taxes.

5. Running side lines of water lots, note, 23 **Am. Dec.** 536.
CLXXXV Cal.—30

APPEAL from a judgment of the Superior Court of Los Angeles County. Chas. Monroe, Judge. Affirmed.

The facts are stated in the opinion of the court.

Milton K. Young, Davis, Kemp & Post and Kemp & Clewett for Appellants.

Goudge, Robinson & Hughes for Respondent.

SHAW, J.—This is an action in unlawful detainer. The plaintiff recovered judgment and the defendants appeal.

The complaint alleged an unlawful holding over after a default upon a covenant by the lessee to pay the taxes assessed against the leased premises, followed by a notice to pay the same or quit within three days. The defendants failed to make payment within the three days and shortly afterward this action was brought.

The plaintiff was the owner of lots 176 and 177 of the Crescent Bay Tract in Santa Monica. These lots extended from a walk along the ocean front southwesterly to the line of ordinary high tide. Upon lot 176 it had erected a large pier extending some 250 feet along the waterfront and into the ocean beyond the line of ordinary high tide several hundred feet. The land end of this pier was situated on the upland about fifty feet from the line of ordinary high tide as it existed at the time of making the lease. The lease embraced a strip approximately fifty feet wide leading from the walk aforesaid to another strip extending across the said lot substantially parallel with the ocean front, both of which strips were to be used in common by the lessor and the lessee and the public as means of access to said pier. It also included the whole of said pier, all of which, except a small portion of the inner end thereof situated above high tide, was built upon piles driven into the ocean-bed below high-water mark.

The lease was executed by the plaintiff to the Ocean Park Pier Company. It was for the term of fourteen years, beginning February 1, 1914, with an option to extend the same, if desired, for the further period of thirty-six years. It contained a covenant that in addition to the rentals mentioned therein the lessee should "pay all taxes which may

be levied upon said property during the term of this lease.''
It provided that the failure of the lessee to pay such taxes
when they became due, or before they became delinquent,
should terminate the lease; that if the lessee failed to pay
such taxes the lessor at its option might pay the same, and
that the taxes so paid by the lessor should be repaid to it by
the lessee on the first rental day thereafter, together with
interest. The rental day was the first day of each month
during the term. It was provided also that if any default
should be made in any of the covenants of the lease by the
lessee the lease should cease and terminate and it should be
lawful for the lessor to enter upon the demised premises
and to remove all parties therefrom. The complaint set
forth these portions of the lease, and further alleged that
the taxes levied and assessed against the property of the
plaintiff, including the leased premises, for the second half
of the fiscal year 1917–18 amounted to $2,892.22, and that
the proportional part thereof chargeable to the leased prem-
ises amounted to $970.50; that the latter sum was not paid
by the lessee, and would have become delinquent on April 30,
1918; that upon April 29, 1918, plaintiff paid all the
taxes assessed against its property aforesaid, including
the aforesaid amount chargeable to the leased premises,
and thereupon, on April 29, 1918, demanded the same
from the lessee; that the first rental day following that
day was May 1, 1918; that the defendants did not re-
pay said amount on May 1, 1918, nor at all; that on
May 9, 1918, demand in writing was made by plaintiff
upon the defendants herein for the payment of said sum
of $970.50, or that the defendants surrender possession of
the premises within three days, and that the defendants re-
fused to pay the same or to quit possession of the premises,
and ever since have unlawfully held possession thereof. The
defendants other than the Ocean Park Pier Company are
sublessees of said company under the aforesaid lease.

[1] The defendants contend that the complaint does not
state facts sufficient to constitute a cause of action because,
as they say, while the lease provided that the defendant
Ocean Park Pier Company should pay all taxes levied upon
the leased premises during the term of the lease, there is
no allegation that any tax was ever levied upon said leased
premises. We think this claim is based upon an entirely

too narrow view of the effect of the language of the complaint. It alleges that the second installment of the taxes levied against the property of the plaintiff was $2,892.22 for the year 1917–18, and that $970.50 was the proportional part of said taxes chargeable against the leased premises. As is customary, all the taxes were assessed to the plaintiff as the owner thereof in connection with its other property. (*Graciosa O. Co.* v. *Santa Barbara Co.,* 155 Cal. 143, [20 L. R. A. (N. S.) 211, 99 Pac. 483].) The complaint therefore clearly alleges that the assessment against its entire property was $2,892.22, and that of this, $970.50 was levied against the leased premises. There is no merit in this contention.

[2] The next claim of the defendants is that the court erred in allowing testimony in the case which they assert was an attempt to vary the terms of the assessment-roll showing the assessment of the taxes in question. It appeared from the assessment-roll that the plaintiff was assessed with the whole of lots 176 and 177 in said addition, and that upon lot 176 the assessment included $103,770 as the value of the lot, and forty-three thousand six hundred dollars as the value of the improvements thereon. The leased premises, as we have shown, included only parts of lot 176. In order to show the proportion of the taxes properly chargeable to the leased premises the plaintiff placed upon the stand the deputy county assessor who had made the assessment upon the property for the year 1917, and the city assessor of Santa Monica who had made the assessment for city purposes upon said property for that year. These two witnesses were able to recall the fact that they had placed certain valuations upon the improvements which were leased to the defendant Ocean Park Pier Company, and that said sums were included in the total valuation shown upon the assessment-roll, and they so testified. It is this testimony which the defendants claim was a variation by parol of the terms of the assessment-roll. We do not think it was contradictory or in conflict with the assessment-roll, nor that it in any way came within the rule which forbids the introduction of parol testimony to vary or explain a writing or record. The covenant upon which the defendants were bound was to pay the taxes levied upon the leased premises. It chanced that the lessor owned other property and that it was all assessed

together, the leased property not being segregated so that the taxes levied thereon could be ascertained from the assessment-roll. In order to carry out the terms of the lease it was therefore necessary to ascertain the proportion of the taxes properly chargeable upon the leased premises. To do this it was proper to find how much of the total assessed valuation of the property was given to the leased premises by the officials who made the valuations stated in the assessments. If the officials who made the assessment had not been at hand, the only way this could have been ascertained would be by calling other witnesses to testify to the respective values of the different parcels of the property included in the total, and assigning to the leased property its due proportion of the total, according to such valuations. This would be at best but an approximation of the actual taxes imposed upon the leased premises. But when the officers who made the assessment could testify as to the actual valuations they placed upon such property, which valuations became a part of the total valuation charged to the plaintiff, the calculation, instead of being an approximation, became exact. It did not in any respect change the assessment-roll. It was merely a means, and the best and most appropriate means, of ascertaining the exact taxes levied against the leased property.

Defendants next contend that $970.50 is more than was due for the taxes assessed against the leased premises. This claim is based upon the testimony to the effect that in computing the proportional part of the taxes due from the lessee, the right of way extending through the lot to the pier was assumed to be fifty feet wide, whereas, according to the testimony of one of the witnesses for the plaintiff, it was only forty-seven feet wide at one end and forty-three feet wide at the other. The map introduced in evidence showing the distances states that the right of way was 49.33 feet wide at one end and forty-seven feet wide at the other. They also claim that inasmuch as the right of way was to be used in common by the parties and by the public for access to and egress from the pier and other buildings on the lot, the lessee did not get absolute possession thereof and should not be charged with its entire value. The lease designated this right of way as a fifty-foot entrance, and it provided that the lessee should maintain the same at its own expense until

a building was erected upon those parts of the lessor's lots which were not included in the lease, after which the expense should be equitably divided between the two. It is claimed that the taxes would be a part of the expense of maintenance which should have been paid *pro rata* by each party.

There are several answers to this objection. In the first place, the value of the land embraced in the lease was computed upon the front foot basis in apportioning the tax. The frontage of the lessee, as calculated, was fifty feet, being the assumed width of the right of way. The frontage of the lessor was 275.5 feet, being all of the remainder of the frontage of lot 176 and one foot which seems to have been situated in lot 177. The 275.5 feet of frontage charged to the lessor extended only to the mean high-tide line, a distance of approximately 125 feet. The fifty-foot strip extended to the mean high-tide line and thence several hundred feet into the ocean, to the outer end of the pier. It was therefore presumably of greater value proportionally than the frontage of the lessor. Furthermore, we have been directed to no evidence indicating that at the time this assessment was made there were any buildings upon the portions of lot 176 not included in the lease, in which event, assuming that the expense of maintenance included taxes, the burden would be upon the lessee to pay such taxes upon the entire value of the right of way, under the terms of the lease. But there are other reasons which we think entirely satisfactory for upholding the finding of the trial court that $970.50 was a fair and just amount due from the defendants under the lease for the second half of the taxes of 1917. [3] One is that the evidence was conflicting upon this subject, and, of course, a finding upon conflicting evidence is conclusive in the appellate court. [4] Another reason is found in the following facts: From the beginning of the lease until and including the year 1917, it had been the custom of the lessor and lessee to settle the taxes in the following manner: As soon as the assessment-roll was made out in the fall of each year the lessor would make up a statement of the amount of taxes properly chargeable to the lessee, and render such statement to the lessee showing the amount due for each installment of taxes. Thereupon, as the tax fell due, the lessee would pay the amount charged to it in said statement, and the matter would thus be settled. This occurred each year. In 1917

the statement was rendered by the lessor to the lessee in the fall as usual.  It stated that the amount properly chargeable to the lessee for that year's taxes was $970.50 for the first installment and $970.50 for the second installment.  It was in the nature of a stated account.  No objection whatever was made thereto, and in pursuance thereof the lessee paid $970.50 for the first installment of the taxes of that year, which fell due in November.  No objection to the amount was ever made, nor was any objection to the amount demanded for the second installment made at any time, until after the beginning of this action.  Under these circumstances we think the rendition of the statement, the payment of the first installment in accordance therewith and the failure to object to the amount thereof must be taken as an admission by the lessee that the amount charged was fair and just, and, so considered, it is sufficient to support the finding to that effect.

[5]  It is next contended that the assessment was wholly void and consequently that no claim could be made against the lessee on account thereof.  This claim is based on the theory that upon the trial it was discovered that if the line dividing the two cities was extended in the same direction into the ocean a very small portion of the pier situated at the extreme end thereof, far out into the ocean, would be on the Venice side of that line.  Upon this it is claimed that this part of the leased premises was not within the limits of the city of Santa Monica.  Upon this point the court found that a small portion of the southwesterly corner of the pier would be intersected by an extension of the boundary line between Santa Monica and Venice beyond the line of mean high tide, but that if that portion of the pier southwesterly of said boundary line so extended was taken into consideration by the respective assessors in making the assessments upon the property as being within the city of Santa Monica, the amount which the lessor asked the lessee to pay as the proportional amount of taxes due for the second half of 1917 was not affected thereby to a substantial extent.

This point is to some extent covered by the fact that a statement was duly rendered to the lessee showing the amount and no objection was made thereto, but the same was acted upon by the lessee in the payment of the first installment of taxes.  There is, however, another answer, more

complete and satisfactory. It will be observed that the court did not find expressly that any part of the pier was situated within the limits of the city of Venice. This finding was that part of it was situated southwesterly of the boundary line between the two cities if the same were extended beyond the mean high-tide line out into the ocean. The discovery that this was the fact arose from the introduction in evidence of a plat made by a surveyor showing the subdivision of the Crescent Bay Tract in Santa Monica, bordering upon the ocean and extending southeasterly to the division line between the two cities. The direction of this division line indicated that it might intersect the pier at its outer end and thereupon the court elicited testimony from the surveyor to the effect that this would be its effect, if extended. All the parties appear to have assumed that the division line which marked the jurisdiction of the respective cities over the water beyond high-tide line would be the line of the boundary extended into the water. It appears that this line is not perpendicular to the shore line at that point, but strikes it at an angle, less than ninety degrees on the Venice side and more than ninety degrees on the Santa Monica side. Under the law applicable to such matters it is not true that the rights of adjoining owners of land bordering upon tide water, or upon a navigable lake or stream, in the land under the water upon which both tracts abut are to be ascertained by extending the line of the boundary between them in its original direction into the water, to the center thereof in the case of a stream, or indefinitely in the case of the ocean. On the contrary, the rule is that the area over which such rights as each proprietor may have in the land under the water upon which his tract abuts, and to the use of the water covering the same, is not fixed by extending his boundary line into the water in the direction of the last course ending at the shore line, but is fixed by a line drawn into the water perpendicular to the shore line; that is, to the general course of the shore line at that point. Unless extraordinary conditions occur, this is the rule to be applied in defining the respective rights of such owners to the space in front, under, upon, and in the water. If accretions occur in front of the land the boundary line between them as to such accretions is a line extending into the water perpendicular

to the original shore line in its general course and not by the line of the boundary extended in its original direction. If this were not the case it will be seen that where the boundary line strikes the shore line at an acute angle the rights of one proprietor would extend in front of the land of the other so as to practically cut him off from the use of the water. The authorities are all to the effect that this is not the case. (3 Farnham on Waters, pp. 2476, 2477; *Menesha etc. Co.* v. *Lawson*, 70 Wis. 600, [36 Wis. 412]; *People* v. *Schermerhorn*, 19 Barb. (N. Y.) 540.) The same rule, of course, applies, in the absence of any statute to the contrary, to the bounds of municipal jurisdiction over waters of the ocean. From this principle it follows that the line dividing the jurisdiction of Santa Monica and Venice over the ocean in front of each city is not the extension of the line of the final course of the division line terminating at the mean high-tide line, but is a line drawn from the intersection of that boundary with the shore line into the ocean in a direction perpendicular to the general course of the shore line at that place. If the shore line is circular it will be perpendicular to a tangent drawn on the circle at the point of such intersection. It follows that no part of the pier is within the jurisdictional limits of the city of Venice and that the objection is without foundation in fact.

[6] The Ocean Park Pier Company, on May 1, 1918, after the demand had been made upon it for the payment of its share of the taxes, paid to the lessor the rent of the premises falling due on that day. It is claimed that the acceptance of the rent then paid was a waiver of the default in the payment of the taxes, and that it estops the plaintiff from claiming such default and from enforcing the forfeiture of the lease by reason of that breach of the covenant thereof. Appellant's brief states the point, but does not argue it, except to suggest that this acceptance of the rent without insisting on payment of the tax on that rent day, operated to postpone the time of payment of the taxes until the rent day in June. We can see no reason for the conclusion contended for. The terms of the lease are clear to the effect that in case the lessee fails to pay the taxes for any year or any installment thereof and the lessor thereupon pays them, the amount thereof chargeable to the lessee upon the leased premises must be paid to the lessor at the

next rent day thereafter. The covenant to pay the taxes and the covenant to pay the rent are wholly separate and independent. The payment of one does not depend upon the payment of the other, nor does the acceptance of the rent operate as a waiver of the obligation to pay the taxes. The failure to pay the taxes was as much a breach of the lease as it would have been had there been also a failure to pay the rent, and the acceptance of the rent in no wise satisfied the obligation to pay the taxes. There seems to be no foundation for any argument in favor of the asserted waiver and estoppel.

These comprise all the points made by the defendants in support of the appeal. Inasmuch as we find all of them to be without merit, it follows that the judgment must stand.

The judgment is affirmed.

Olney, J., Lennon, J., Sloane, J., Wilbur, J., Angellotti, C. J., and Lawlor, J., concurred.

The court filed the following opinion on April 30, 1921:

THE COURT.—The discussion in the opinion concerning the common-law rule on the subject of the direction of the extension of boundary lines into streams, lakes, or ponds, when the lands of different persons abut thereon and the rights of the land owners in or upon the water is involved, is wholly based upon the facts shown in the record on appeal. It was not intended to be a decision construing the terms of the Santa Monica charter on the subject. The charter in connection with the sections of the Political Code defining county boundaries, to which the charter refers, leaves it somewhat difficult to determine whether the boundaries do or do not extend into the ocean. We withhold any expression of opinion on that subject. The judgment of the superior court on the point involving this question is sustained on the other ground mentioned.

All the Justices concurred.