**Kurt W. RIETSCH, Plaintiff-Appellant,**

v.

**T.W.H. COMPANY, INC., d/b/a Range Line Bowlarama, Defendant-Respondent.**

Nos. 13480, 13497.

Missouri Court of Appeals, Southern District, Division Two.

Nov. 26, 1985.

Jerry E. Wells, Joseph W. Schoeberl, Joplin, for plaintiff-appellant.

Phillip A. Glades, David Robards, Joplin, for defendant-respondent.

HOGAN, Presiding Judge.

Plaintiff Kurt W. Rietsch, owner and record title holder of an open shopping center known as the Elms Center Shopping Center, brought this action in three counts against the defendant, which is one of his tenants. Averring various breaches of the defendant's lease, plaintiff sought 1) possession of the demised premises; 2) recovery of the sum of $31,875 for the breach of two covenants contained in the lease and $3,000 as attorney's fees, and 3) a temporary restraining order enjoining the defendant from removing any "possessions or property located in the demised premises."

The trial court found the issues tendered by Count I (for possession) and Count II (for a temporary injunction) to be moot but rendered judgment for the plaintiff and against the defendant in the amount of $10,078.99. Appeal No. 13480 is defendant's appeal. Appeal No. 13497 is plaintiff's cross-appeal. We affirm the judgment of the trial court.

As a threshold matter, we must consider defendant's assertion that plaintiff's notice of appeal was untimely and therefore vested no jurisdiction of Appeal No. 13497 in this court. We agree that the timely filing of a notice of appeal is jurisdictional, and that a judgment becomes final for the purpose of appeal thirty days after the entry of judgment unless a timely motion for new trial or in court-tried cases, the motion authorized by Rule 73.01(a)(3) is filed. Rule 81.05(a); *Goldberg v. Mos*, 631 S.W.2d 342 (Mo.1982). The judgment in this case was rendered and entered August 26, 1983; the judge's docket entry specifically so recites. No after-trial motion was filed. The judgment therefore became final for purposes of appeal September 26, 1983, as September 25, the thirtieth day after entry of the judgment, was a Sunday. Rule 44.01(a). Notice of Appeal was filed by the defendant in Appeal No. 13480 on October 3, 1983, 7 days after the judgment became final. Therefore, defendant's Appeal No. 13480 was timely commenced under the provisions of Rule 81.04(a). Notice of cross-appeal was filed by the plaintiff on October 13, 1983. Rule 81.04(b) provides that if a timely notice of appeal is filed by a party, any other party may file a notice of appeal within ten days of the date the first notice of appeal was filed. Therefore, the notice of cross-appeal in Appeal No. 13497 was timely filed and this court has jurisdiction of both appeals.

The merits of the appeals turn on the interpretation of a shopping center lease. The lease, 15 pages long, covers a bowling alley which is part of the Elms Shopping Center, located at Seventh and Range Line in Joplin. The center is an open center; when construction of the three buildings

which make up the center was completed in 1966, the total leasable space in the shopping center was 112,975 square feet. The common facilities, as far as we can determine, consist entirely of a parking lot.

On November 18, 1968, the defendant executed a lease covering approximately 24,486 square feet in one of the buildings located in the shopping center. The space was to be used as a bowling alley, which the defendant operated under the name "Bowlarama." Defendant was also granted access to and exclusive use of a 600 square foot section in the basement of the premises for activity incidental to defendant's operation of the bowling alley. The lease provided for a base rent, a percentage rent based on annual sales over $250,000 and a "tax escalator" or "tax stop" clause requiring the tenant to bear the increase in taxes. This "tax escalator" clause is the principal source of controversy on defendant's appeal. It will be set out at length presently. The lease also contained a penalty provision which required a defaulting holdover tenant to pay double rent during the holdover period. The developer of the center was the Republic National Life Insurance Co. of Dallas, Texas, but the original lease was executed by the defendant as "tenant" and by Charles Parrish and his wife as "landlord." We are obliged to assume that whatever interest Mr. Parrish had in the center was salable; several different "landlords" appear in the record; the nature of their interest does not appear.

The original lease was supplemented in December 1968, but that supplement is of no consequence on these appeals. In August 1975, a document entitled "Lease Amendment and Extension # 1" was executed by the defendant as "tenant" and by "L.T. Properties, Inc.," as "landlord." As premises, this amendment and extension recited the existence of the original lease; that L.T. Properties had become "owner of the Demised Premises and the Landlord of Tenant"; that the parties wished to enter into a new lease; that all of the terms of the original lease were incorporated, except that a) the premises demised would consist of 25,084 square feet; b) the base rental would be increased from $1,500 per month to $1,625 per month *for that period commencing '4-1-76' to and including June 30, 1983* (our emphasis), and c) the charge for common facilities would be increased from $200 to $304 per month. The original lease provided that the demise was for a term of seven years with an option to renew for seven years. If the option was exercised the lease would determine June 30, 1983. So, because the modification of August 1975, commenced the renewal period three months earlier than was originally contemplated, the lease determined June 30, 1983. The renewal of the lease, as we shall see, triggered the tax escalator clause.

Plaintiff's Exhibit 12 shows that in 1968, $11,500 in taxes was paid by the original landlords. Plaintiff's Exhibits 13, 14, 15, 16 and 17 show that in 1976, L.T. Properties paid real property taxes in the amount of $23,437.28. In 1977, L.T. paid $22,556.16 in real property taxes; in 1978, $22,732.40; in 1979, $23,172.95; in 1980, $23,128.89. The real estate tax statements themselves, under the heading "value," indicate the assessed valuation of the entire center from 1977 through 1980 was $440,550. In 1981, the Board of Equalization, at the request of some unidentified person, reduced the total assessed valuation of the shopping center from $440,550 to $220,280. This brought the assessed valuation below that for the index year, 1968, which was $398,160. Therefore, the years in which the tax escalator was operative were 1976, 1977, 1978, 1979 and 1980.

Plaintiff Rietsch purchased Republic National's interest in the property and took the leases by assignment. Plaintiff was determined to sweep with a new broom. Republic having given him the right to collect any sums due under the tax escalator clause, subject to apportionment between the two, plaintiff proceeded to make demand for the cost of utilities furnished and for tax increases owed by the defendant. As we are able to decipher the record, plaintiff first calculated the amount due

him for utility reimbursement from July 1980 to June 1981, under the tax escalator clause. This came to $13,960.72, which the defendant paid. By letter dated November 19, 1981, plaintiff advised the defendant that by his calculations, defendant owed $15,625.02, based on a "square foot" calculation. Rietsch interpreted the lease to mean that defendant would pay a proportionate share of the tax increase based on the percentage of the total square footage available in the center. Rietsch's figure excluded the basement area. Excluding the basement space, plaintiff calculated that defendant had occupied 25,084 square feet of a total of 112,975 available, and would therefore owe about 22 percent of the tax increase for each year since the beginning of the period of extension. Rietsch then came up with a figure of $13,861.43. Rietsch admitted his first calculations had been based on "incorrect" information obtained from the Jasper County Collector's office. Plaintiff engaged in prolonged negotiation with the defendant but he was unsuccessful. By letter dated December 8, 1981, plaintiff gave notice, of sorts, of termination of the lease, but continued to accept the previously agreed ground rental until the lease determined in June 1983. Plaintiff thereafter demanded penalty rent in the amount of $3,250 and for attorney's fees and costs in the amount of $3,000. Such is the general background of the case; other facts will be noted in the course of the opinion.

## APPEAL NO. 13480

■ Appeal No. 13480 is the defendant's appeal. Again as a threshold matter, we must consider certain limitations upon the scope of our review. This is a bench-tried case and it may be conceded that present Rule 73.01(b) specifically provides that no after-trial motion is necessary to preserve any matter for appellate review. Nevertheless our review, even in court-tried cases, is limited to those issues put before the trial court. At least twice in

recent years, in reviewing cases tried to the court, our Supreme Court has held that an appellate court will not, on review, convict a trial court of error on an issue which was not put before it to decide. *In re Reorganization of Levee Dist. No. 3 of Mississippi County,* 695 S.W.2d 450, 456, n. 6 (Mo. banc 1985);[1] *Lincoln Credit Co. v. Peach,* 636 S.W.2d 31, 36 (Mo. banc 1982) (review of declaratory judgment action), *appeal dismissed* 459 U.S. 1094, 103 S.Ct. 711, 74 L.Ed.2d 942 (1983). The defendant now contends that the "tax escalator" or "tax saving" clause in the lease was so vague and indefinite as to be unenforceable. No such contention was presented to the trial court and we cannot consider it.

■ A second point advanced by the defendant is that the court's judgment is erroneous because the plaintiff did not give the defendant proper and timely notice of the amount of the increase in taxes. Defendant argues that the plaintiff is guilty of laches and is equitably estopped to claim any increase in taxes on the demised premises.

The tax escalator or "stop loss" provision reads as follows:

"If the option to extend as hereinabove provided is exercised, Landlord shall determine as of the effective date of such extension whether either *the taxes* or the cost of the utilities hereby furnished *have been increased* since the beginning of the original term of this lease and if so, Tenant shall during the term of such extension pay as additional rental *the increase in taxes* and the cost of the utilities furnished; that is, the first such increases shall be determined for the first year of the extended term and subsequent such increases shall be determined as soon as reasonably possible for each year thereafter. The base year for determining such increases shall be 1968, and *payment thereof shall be made* to Landlord immediately upon Tenant's being notified of the respective increases due." (Our emphasis.)

---

**1.** The footnote cited reads: "Appellants' brief raises ten issues. Appellants, however, are limited to only those matters properly presented to the trial court."

The evidence relevant to this point was that when Rietsch bought the Elms Shopping Center from Republic National Life, he knew the defendant had not paid the amounts due under the tax escalator clause. However, Republic provided Rietsch very little documentation—what he called "a very sketchy analysis of the entire property." On November 19, 1981, plaintiff sent the defendant a letter, stating that a review of the lease indicated defendant was to pay "a proportionate percentage of the annual property taxes." Plaintiff calculated defendant's arrearage on the assumption that the tax escalator clause required the defendant to pay 22.2 percent of the real property taxes assessed because defendant occupied 22.2 percent of the leasable space in the center. Upon trial, Rietsch testified that the information upon which he based his original calculations was erroneous. Nevertheless, Rietsch again requested payment on December 1, 1981, and on December 8, 1981, notified defendant that he had exercised his right to terminate the lease; a schedule attached to this letter indicated the amount due under the tax escalator clause was $13,861.43. The amount originally demanded had been $15,625.02.

Defendant's evidence was that the tax escalator clause was discussed at the time the lease was renewed. Its understanding was "[the lessor] could review that portion of our lease, our taxes and our utilities at that time and if there [had] been raises then [the landlord] would assess us at that time." Mr. St. Clair, testifying for the defendant, indicated that the "landlord" had furnished him with no statement of any tax increase in 1977, 1978, 1979 and 1980. The matter of delinquency under the tax escalator clause was discussed "at a meeting," perhaps in October 1981, but St. Clair disregarded the demand because he went to the county collector's office and the county assessor's office and found that the amount due for the base year was wrong.

Assuring us there can be no question that the lease required the lessor to notify defendant of the amount of rental due be-cause of increased taxes "timely and properly" and citing us to *CMC Corporation v. Groth,* 649 S.W.2d 952 (Mo.App.1983), defendant argues that because it did not receive a timely notice of each tax increase, plaintiff is barred by laches. As we read the case, our colleagues at St. Louis rejected a similar argument in *CMC Corporation,* although the sublease there in question specifically provided " 'any increases in rent [under the prime lease] shall be passed along to the Sublessee.' " In *Conservative Federal Savings & Loan Ass'n v. Warnecke,* 324 S.W.2d 471 (Mo.App.1959), the same court held a similar clause did not require notice from the landlord to become effective, even though only the landlord had the requisite information to compute the new rent. The plaintiff made his demand well within the applicable statute of limitations, § 516.110(1), and for the reasons stated in *CMC Corporation,* we find that the plaintiff was neither guilty of laches nor barred by equitable estoppel.

The amount of the increase, as we construe the tax escalator clause, could have been determined by the defendant by resort to the same records from which the "mistake" was discovered. Again as we construe the lease, the yearly increase was determinable as soon as the property was assessed. The notice provision of the tax escalator clause did not make the *debt* conditional upon notice; it made *payment* of the debt conditional upon notice. *Park View Manor, Inc. v. Housing Authority, Etc.,* 300 N.W.2d 218, 230 [14, 15] (N.D. 1980).

The real question in issue is whether the tax escalator clause, properly construed, required the defendant to pay a share of the increased taxes proportionate to that part of the total leasable space it occupied, or only obligated the defendant to pay the increase in taxes upon the building it occupied. The construction of the lease is put in issue very directly by plaintiff's point two on its cross-appeal and is obliquely tendered by defendant's point two. Both parties object to the trial court's calculation of the amount owed to the plaintiff by the

defendant. We shall consider point two on defendant's appeal and points one and two on plaintiff's cross-appeal together.

Plaintiff and his counsel have at all times maintained that because defendant occupied 25,084 square feet of the 112,975 leasable square footage in the Elms Shopping Center, the tax escalator clause required the defendant to pay 22 percent of the tax increase, if any, above the base year, 1968. The defendant insisted that it had agreed to pay only the increased taxes on the demised premises. The trial court concluded that under the terms of the lease, "the Defendant is not required to pay 22.2 percent or 22.7 percent of the total taxes which may have been paid by Plaintiff on his total holdings." There was only a general request for Findings of Fact and Conclusions of Law, and this was insufficient to require the court to make specific findings. *Dardick v. Dardick*, 670 S.W.2d 865, 867[1] (Mo. banc 1984); *Mills v. Mills*, 663 S.W.2d 369, 375[14] (Mo.App.1983). Nevertheless, it has been held since *Graves v. Stewart*, 642 S.W.2d 649, 651[3] (Mo. banc 1982), that if the court makes voluntary findings, those findings and conclusions form a proper basis for assigning error and can be reviewed on appeal. *Lohrmann v. Carter*, 657 S.W.2d 372, 376 (Mo.App.1983). On these appeals, a construction of the tax escalator clause is required. In construing the lease, we have looked to the views of specialist practitioners of the time when the Elms Shopping Center was developed,[2] as well as to the lease as a whole. A lease is both a conveyance and a contract. *C & J Delivery v. Vinyard & Lee & Partners*, 647 S.W.2d 564, 568 (Mo.App.1983); *Kamada v. RX Group Ltd.*, 639 S.W.2d 146, 148[1-4] (Mo. App.1982). In our opinion, the tax escalator clause is ambiguous as a contractual obligation. In construing a term or provision of doubtful meaning, this court must give such construction as will be fair and reasonable, considering the relationship of the parties, the subject matter of the contract, the usages of the business, the surrounding facts and circumstances attending the execution of the instrument and its interpretation by the parties. *Gabel-Lockhart Co. v. Gabel*, 360 Mo. 518, 525–26, 229 S.W.2d 539, 543[3] (1950); *Paisley v. Lucas*, 346 Mo. 827, 839, 143 S.W.2d 262, 268 (1940), and cases there cited.

Looking to the commentary available to us, it was doubtless the developer's intention was to make the lease a "net" lease; such provisions were commonly inserted in commercial leases in the '60's to require the tenants to pay those real property taxes assessed against the shopping center in excess of those levied when the particular premises were delivered to the tenant. *Kranzdorf* 194; *Pollack* 393–94. A somewhat typical clause of this sort, quoted in the *Committee Report*, provides that if in any year the real estate taxes on the entire tract upon which the center is located shall exceed the taxes for a named base year (or exceed a specified dollar amount, or exceed a specified amount by x%), the tenant will then pay, as additional rent, a proportionate share of the excess. 2 Real Property, Probate & Trust J. at 243 (1967). This *Committee Report* also indicates that tenants sometimes arranged to have the leased premises assessed separately for purposes of tax escalation. Id. at 244; see also *Pollack*, op. cit. at 394. Some old cases adjudicated when the shopping center idea was new approved the latter practice, especially when the center was made up of free standing buildings. See, e.g., *Fraser's Million Dollar Pier Co. v. Ocean Park Pier Co.*, 185 Cal. 464, 197 P. 328 (bank 1921). Theoretically, of course, the possible variations are infinite, but in light of the whole record, interpretation of the tax escalator clause is reduced to two possibili-

---

**2.** In particular, the Report of the Committee on Leases, ABA Section of Real Property, Probate and Trust Law, "Drafting a Shopping Center Lease," 2 Real Property, Probate and Trust J. 222 (1967), reprinted Real Estate in Midcentury, Transition, Taxation & Trends 318 (ABA 1974) [hereinafter *Committee Report*]; N. Kranzdorf, Problems of the Developer, 1965 U.Ill.L.F. 173 [hereinafter *Kranzdorf*]; B. Pollack, Shopping Center Leases, 9 Kan.L.Rev. 379 (1961) [hereinafter *Pollack*].

ties: 1) that the defendant agreed to pay a proportionate share of the tax increase on the entire center, or 2) that the clause in question only obligated the defendant to pay the increased taxes chargeable to the demised premises. There is, unfortunately, no course of dealing to which to look; the plaintiff took the lease by assignment and at first had only a summary of the lease to consult. The defendant's only witness, an executive officer of the corporation, admitted he had agreed to pay taxes "on [his] building" on the increase after 1968. As we have seen, the usual business practice of the period permits either interpretation.

The tax⁻ escalator clause refers only to "the taxes" and to the "increase in taxes," without specifying whether the draftsman meant the real property taxes on the whole shopping center or only the increase on the demised premises. We have found only a few cases, all from other jurisdictions, which are helpful. In *Pacific Intermountain Express Co. v. Alexander*, 205 Cal. App.2d 640, 23 Cal.Rptr. 227, 229 (1962), the lease obligated the tenant to pay a basic monthly rental and an "additional rental" based on the amount of city and county taxes " 'which shall be levied upon the land and building appertaining thereto, in which said demised premises are located.' " The lessee claimed ambiguity but the court held that the wording of the lease encompassed the increased taxes imposed on all of the premises of which the demised premises formed only a part. *Id.* 23 Cal. Rptr at 231. See also *Wit v. Commercial Hotel Co.*, 253 Mass. 564, 149 N.E. 609 (1925), wherein a covenant to pay one-third of any increase " 'upon the real estate upon which the leased premises stands' " required the tenant to pay the increased taxes upon the building and the entire surrounding lot as a whole and not, as contended by the tenant, merely upon the building and land it covered.

Another case which is instructive to some degree is *Seaboard Radio Broadcasting Corp. v. Yassky*, 176 Pa.Super. 453, 107 A.2d 618 (1954), wherein the lessee promised to pay all excess " 'taxes assessed or imposed upon the demised prem-

ises and/or the building of which the demised premises is a part.' " The tenant occupied only the third and fourth floors of the building. The court took particular umbrage at the use of the phrase "and/or," but held that the provision was ambiguous, and stated that "for one to contract to pay excess taxes on assessments of property over which he had no control and only the most indirect interest would be ... strange and unusual." The court held that the clause applied only to the demised premises. *Id.* 107 A.2d at 622. The case is informative to the extent it indicates an ambiguous tax escalator clause will be construed narrowly.

Our conclusion with respect to this lease is that the tax escalator clause only obliged the defendant to pay the taxes levied upon the building it occupied. The tax escalator clause does not mention the premises upon which the building stands. We realize that any grant of any interest in realty ordinarily carries with it the land under the building and such adjacent land as is necessary to its use and enjoyment. In this case, however, the lessee retained control of all the land except that under the building as part of the "common facilities," for which a separate charge was made. The basis of our conclusion is very simple. An ambiguity exists; therefore the written lease must be construed against the party which drew it, in this case, the landlord. *Stein v. Reising*, 359 Mo. 804, 810, 224 S.W.2d 80, 82[2] (banc 1949); *Keith v. Tucker*, 483 S.W.2d 430, 434[3] (Mo.App. 1972); *Gromer v. Watson*, 241 Mo.App. 77, 80, 233 S.W.2d 45, 47[2] (1950). There are other and cogent reasons for construing the covenant to pay taxes narrowly; we need not lengthen the opinion by setting them out. See 2 R. Powell, Law of Real Property ¶ 241, p. 372.5–72.7 (1983).

The calculation of the amounts due the plaintiff from the defendant is, as noted, questioned by both parties. Plaintiff's argument that the trial court did not take the City of Joplin's taxes into account is directly refuted by the record, specifically, the

evidence of the county assessor that the annual levies to which he testified included the real property tax levy for both the city and the county.

Otherwise, the defendant was permitted—without objection—to attack the assessment of the Elms Shopping Center by adducing evidence that the total tax valuation of the shopping center in the base year—1968—was less than the sum of the valuations of the land and component structures. Mr. Willis, the county assessor, testified that his valuation of defendant's building for the tax year 1968 was $192,225 (including the land under the building) and therefore the assessment for that year was $56,520. The total land in the center was assessed at $12,600; a building occupied by Skaggs Drug Co. was valued at $218,230; a structure occupied by a dry cleaning shop was assessed at $14,980, and a building occupied by Consumers Markets was assessed at $95,830. The total assessment, properly added, is $398,160. Nevertheless, the total assessment valuation transmitted to the county clerk's office and to the county collector's office was $250,000. Mr. Willis was unable to explain the mistake; the error had been made before Willis took office and it was not corrected until 1975 when a change in the law made inspection of the records necessary. The tax statement produced as plaintiff's Exhibit 12 shows that in 1968, the total assessed valuation of the center was $250,000 and the total amount for city and county taxes paid for 1968, the base year, was $11,500. The trial court found that the taxes paid on the entire center in the base year amounted to 63 percent of the amount which should have been paid. The percentage is actually 64 percent, but it is very close. The court then set the base amount, or index, at 63 percent of the valuation $\times$ .01 $\times$ $6.50 (the levy for 1968) and arrived at $2,303.28 as the proper index from which to calculate the defendant's liability.

The trial court then calculated the taxes due on the occupied premises for 1976 at $4,152.96; for 1977, $4,115.65; for 1978, $4,140.52; for 1979, $4,146.74; for 1980, $4,140.52. The base rate (index) calcula-

tion and the amounts owed are embodied in Finding of Fact No. 6. In Conclusion of Law No. 5, employing the same index, the trial court found defendant liable in the amount of $1,849.68 for 1976; $1,812.37 for 1977; $1,837.24 for 1978; $1,843.46 for 1979 and $1,836.24 for 1980. The court also found that plaintiff had paid $900 more than the cost of utilities furnished during defendant's hold over and accordingly gave judgment for the plaintiff in the amount of $10,078.99.

Both parties contend the judgment is incorrect; neither states a cogent reason why it is incorrect, except to restate their own interpretations of the tax escalator clause. Some indication of the freewheeling, even cavalier manner in which the "mistake" was proved may be demonstrated by observing that our courts have, for many years, held that county tax records may not be collaterally attacked. *May Department Stores Co. v. State Tax Commission*, 308 S.W.2d 748, 757 (Mo. 1958); *T.J. Moss Tie Co. v. Allen*, 8 S.W.2d 1038, 1041[3] (Mo.App.1928). Moreover, Dean Wigmore indicated that an assessor's roll is subject to the parol evidence rule. 9 J. Wigmore, Evidence § 2427, p. 94 (Chadbourn rev. 1981). The rule against collateral attack was waived by plaintiff's failure to object. If the assessor's book is subject to the parol evidence rule, the evidence should have been disregarded even though there was no objection, but because no timely objection was made, we cannot disregard it on appeal. *Fox v. Burton*, 402 S.W.2d 329, 335[2] (Mo.1966); *Kimbrough v. Gross*, 268 S.W.2d 56, 60[9] (Mo.App. 1954); R. Hasl & J. O'Brien, Missouri Law of Evidence § 14–4, p. 254 (1984).

Thus the trial court, on a record consisting mainly of waived error, found itself obliged to construe the contract and to compute a base amount or index from which to calculate the defendant's liability. It had these propositions before it: The valuation of the various components of the Elms Shopping Center had been correctly assessed, but the total was incorrect. The

assessor's mistake constituted wholly fortuitous governmental action. All the same, both parties had twice executed the lease knowing that the amount of rent depended upon the real property taxes levied in the base year, 1968. The fortuity, as defendant's evidence shows, was easily discoverable by resort to the public records. A party executing a contract must exercise diligence in determining the facts relevant to the subject matter of the contract. *State ex rel. Missouri State Highway Commission v. Hensel Phelps Const. Co.*, 634 S.W.2d 168, 173 (Mo. banc 1982). Further, there is authority for the proposition that the risk of mistake may be allocated between the parties by the court, short of reformation, when it is reasonable in the circumstances to do so. Restatement (Second) of Contracts § 154(3) and comments c and d (1981). Having scoured the precedents and having found none factually persuasive, we have concluded that the trial court allocated the effect of the unknown fortuity in accordance with the intention of the tax escalator clause, interpreting the contract so as to yield a fair, reasonable and practical result as recommended by the Eastern District in *CMC Corporation*, 649 S.W.2d at 955. To have adopted the index contended for by the defendant, based on the taxes actually due and payable in 1968, would have been unfair, for the assessor's evidence shows the Elms Shopping Center was grossly over-valued from 1976 to 1980. At all times from 1976 to 1980, as shown by the assessor's testimony and by plaintiff's Exhibits 13 to 17, the tax valuation of the Elms Shopping Center was $440,500. Upon request, the County Board of Equalization reduced this tax valuation to $220,280. The court's allocation of the risk of mistake was not, for any reason advanced here, such as to generate a firm belief that its judgment was wrong, or, in view of the evidence received, to amount to error materially affecting the merits of the action so as to warrant reversal. Rule 84.13(b).

### APPEAL NO. 13497

This cross-appeal is plaintiff's appeal. We have already dealt with plaintiff's points one and two. His point three is that the trial court erred in failing to award him double rent. The trial court made this finding: "6. That Defendant was not properly notified as to the amount due for the increases in taxes and therefore Plaintiff could not terminate the lease agreement as he attempted to do so by the letter of December 8, 1981." This appears as a Conclusion of Law.

 The trial court's conclusion cannot be justified on the basis of this court's ruling in *Eskew v. Hawkins*, 619 S.W.2d 361 (Mo.App.1981); in that case, this court held that *"Unless waived by agreement, to effectuate a forfeiture of a lease every requirement of the common law must be scrupulously observed."* (Our emphasis.) *Id.* at 362. Here, the long and involved forfeiture provision, styled *"DEFAULT BY TENANT: REMEDIES OF LANDLORD"* purported to allow the Landlord to terminate the lease without any notice or demand whatsoever. Nor, as plaintiff contends, is this case comparable to *Passive Investors, Inc. v. International Merchandising and Printing Company*, 646 S.W.2d 870, 871[1] (Mo.App.1982), because the lease before us did not provide any method for giving notice of forfeiture for breach of condition. The rule by which this point is governed is that a trial court's ruling in a court-tried case will be upheld if it is correct, even though a wrong or insufficient reason is given therefor. *Edgar v. Fitzpatrick*, 377 S.W.2d 314, 318[12] (Mo. banc 1964); *Reed v. Foulks*, 675 S.W.2d 695, 697–98 (Mo.App.1984).

 Here, the landlord, Rietsch, continued to treat with the defendant, attempting to negotiate a new lease, from December 1981 until the expiration of the term thereof in 1983, all the while accepting the base rental. Rietsch's testimony was that during the negotiations he agreed to keep collecting the same rental "they had been previously paying" "[i]n exchange for not attaching the property there" and because "[he] felt we were going to reach some kind of an agreement." He did not

particularly want the defendant out of the premises. Generally speaking, the acceptance by a landlord of rent which accrues after the breach of condition contained in a lease implies a waiver of the right to declare a forfeiture for that breach unless there are circumstances arising from such acceptance which negative the presumption of the lessor's affirmance of the lease. *Haack v. Great Atlantic & Pac. Tea Co.,* 603 S.W.2d 645, 653 (Mo.App.1980). Of course, the acceptance of rent, which accrues after the breach of covenant or condition does not establish waiver as a matter of law; the question whether waiver occurred is primarily an issue of intent. *Id.* at 653–54.

The letter which purports to invoke a forfeiture is not absolute in its terms; the final paragraph indicates a desire to negotiate. The fact that Rietsch did not wish to evict the defendant, the fact that he continued to negotiate with defendant for a year and one-half at an agreed rental and that he accepted the base rental during the period of negotiation furnished the basis for an inference that the landlord intended to waive the breach, even though such inference must clearly appear. The trial court did not err in denying the plaintiff double rent.

As to plaintiff's final contention, we cannot confidently say the trial court erred in refusing to allow the plaintiff an attorney's fee. The lease did contain a provision for recovery of an attorney's fee if the landlord was obliged to employ an attorney "to enforce ... any of the Landlord's rights or remedies" but this provision was included as part of the forfeiture clause entitled *"DEFAULT BY TENANT: REMEDIES OF LANDLORD."* As its Conclusions of Law Nos. 7 and 8 show, the trial court interpreted the provision for attorney's fees to apply only to the enforcement of a forfeiture. It may be that this construction is too narrow, but the plaintiff has not undertaken to demonstrate why it is too narrow other than to assert that the provision for attorney's fees was applicable to any litigation brought under the lease

and to cite two wholly inapposite cases. This is insufficient to show that the trial court either erroneously declared or applied the law. Consequently, we cannot say the ruling was error. *Murphy v. Carron,* 536 S.W.2d 30, 32[1–3] (Mo. banc 1976). The judgment is in all respects affirmed.

PREWITT, C.J., and MAUS and CROW, JJ., concur.